IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

OMEGA ADVISORS, INC. et al.,

        Plaintiff,

vs.

CLAYTON LEWIS,

        Defendant.

Case No.: 06-cv-834

# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT'S MOTION TO COMPEL DISCOVERY

| | |
|---|---|
| **LOWENSTEIN SANDLER PC**<br>Attorneys at Law<br>65 Livingston Avenue<br>Roseland, New Jersey 07068<br>973.597.2500<br>Attorneys for Clayton Lewis | **KROVATIN KLINGEMAN LLC**<br>Attorneys at Law<br>744 Broad Street, Suite 1903<br>Newark, New Jersey 07102<br>973.424.9777<br>Attorneys for Clayton Lewis |

# TABLE OF CONTENTS

|   |   | PAGE |
|---|---|---|
| TABLE OF AUTHORITIES | | ii |
| PRELIMINARY STATEMENT | | 1 |
| ARGUMENT | | 3 |
| I. | OMEGA MUST PRODUCE TO MR. LEWIS ALL OF THE DOCUMENTS IT VOLUNTARILY PRODUCED TO THE GOVERNMENT. | 3 |
| II. | OMEGA MUST PRODUCE TO MR. LEWIS ALL PRIVILEGED DOCUMENTS AND INFORMATION RELATING TO THE UNDERLYING INVESTMENT TRANSACTION AND ALL OTHER LEGAL WORK FOR WHICH OMEGA BILLED MR. LEWIS OR PHAROS. | 5 |
| III. | OMEGA HAS PUT PRIVILEGED INFORMATION SQUARELY "AT ISSUE". | 8 |
| | A. Omega Has Made Advice of Counsel the Central Issue in This Case and Thus Has Waived Privilege. | 8 |
| | B. Omega's Indemnification Claim Places Privileged Information at Issue. | 10 |
| CONCLUSION | | 10 |

# TABLE OF AUTHORITIES

**PAGES**

**CASES**

Long Island Lighting Co., 129 F.3d 268 (2d Cir. 1997)..................................................................5

In re The Leslie Fay Cos., Inc. Securities Litigation,
    161 F.R.D. 274 (S.D.N.Y. 1995).............................................................................................4

Pereira v. United Jersey Bank, Nos. 94 Civ. 1565, 94 Civ. 1844, 1997 WL 773716 (S.D.N.Y.
    Dec. 11, 1997) .........................................................................................................................8

**RULES**

Fed. R. Crim. P. 6(e)........................................................................................................................5

Defendant Clayton Lewis respectfully submits this reply memorandum of law in further support of his Motion to Compel Discovery from Plaintiff Omega Advisors, Inc. ("Omega").

**PRELIMINARY STATEMENT**

In this case, Omega is withholding large numbers of documents based on claims of privilege, including documents addressed to Mr. Lewis, documents reflecting advice given to Mr. Lewis, documents reflecting advice given to Mr. Lewis's company, Pharos Capital Management, LP ("Pharos"), and documents provided to the government with no restrictions that now reside in the hands of third parties. Many of Omega's claims of privilege are clearly designed to obstruct discovery in a manner that has become the norm in this case, requiring Mr. Lewis to expend scarce resources to obtain discovery that should have been provided as a matter of course.

In an effort to mask its plainly obstructive tactics, Omega claims that this motion is a "fishing expedition," but that allegation is not supported by the facts. In his moving papers, Mr. Lewis set forth the legal authorities that require the production of the following clearly defined sets of documents:

\* The documents turned over to the United States Attorney's Office for the Southern District of New York ("USAO") by Omega in an effort to persuade the USAO not to seek an indictment of Omega;

\* The set of documents concerning the legal advice provided to Omega and Pharos related to the investment in Azerbaijan between January 1, 1998 and September 30, 1998, as well as documents relating to legal advice given subsequent to that time for which either Pharos or Mr. Lewis was billed and paid a share of the fees;

\* Legal advice that was communicated to Mr. Lewis and records reflecting legal advice to which Mr. Lewis was a party; and

\* Documents relating to legal work for which Omega is now attempting to seek indemnification from Mr. Lewis, documents that reflect Omega's acquisition of knowledge concerning the financial relationship between Viktor Kozeny and Azeri government officials, and documents that reflect Omega's acquisition of knowledge of the facts upon which it bases its claim that Mr. Lewis received bribes or improper benefits.

The original complaint in this case alleged that Mr. Lewis hid from Omega knowledge of a corrupt relationship between Viktor Kozeny and Azeri officials that was designed to ensure the

success of the investment.[1]  In his Answer and Counterclaims, Mr. Lewis made it clear that other Omega representatives, including attorneys, were informed of the financial relationships during the course of the investment.  The present motion is specifically directed at appropriate disclosure of documents that will demonstrate the truth of Mr. Lewis's position.

Omega's response to the motion contained a number of material misrepresentations.  Mr. Lewis argued in his motion that he is entitled to discovery of legal work performed by Schulte Roth & Zabel in 1998 because Pharos received and paid for the legal work and was a client of Schulte.  In response, Omega informed this Court on July 6, 2009 that Schulte did no legal work of any kind for Pharos in 1998, quoting Schulte's Betty Santangelo that "SRZ did not provide legal 'services' to Pharos in 1998."  Omega Opp. Br. at 16.  Omega repeated variations on this theme several times.  One week later, Omega produced documents that unequivocally reveal that (1) Schulte performed legal work on purely Pharos matters in connection with the Azeri investment in 1998; (2) payments were made by Omega personnel from Pharos accounts to Schulte in at least March, June, and September 1998; and (3) Pharos apparently paid a pro rata share of Schulte's fees for work on Azerbaijan through at least August 1998.  Other documents show that the Schulte partner responsible for the Omega and Pharos relationships considered Pharos a valued client.  Omega's arguments in opposition to the motion are inexplicable in light of these documents.

Omega's arguments concerning its production of documents to the USAO are equally obstructive.  At the time Omega made its production to the USAO, it knew the documents might be produced to criminal defendants over whom Omega could not exercise control.  Those documents

---

[1]  In January, when Omega had the opportunity to press its allegations directly against Mr. Kozeny in proceedings in London, Omega settled its case against Mr. Kozeny for nothing, on the day when Omega's representatives were scheduled to testify.  It is now clear why Omega dropped its "concealed bribery" claims against Mr. Kozeny when it did.  In the criminal case captioned United States of America v. Fredric Bourke, recently completed before Judge Scheindlin, there was unequivocal testimony that Omega representatives were told about Mr. Kozeny's financial relationships with the Azeris by people other than Mr. Lewis.  Omega's original theory of liability is plainly not sustainable; Omega is therefore seeking, in a motion pending before this Court, to change its theory of liability against Mr. Lewis.  With the same level of vitriol and hyperbolic overstatement with which it previously alleged that Mr. Lewis concealed knowledge of bribery, Omega now alleges that Mr. Lewis himself accepted bribes.  Mr. Lewis received no bribes or financial benefits.  Although Omega has presented sound bites of testimony from the criminal case that Omega claims show bribery of Mr. Lewis, they show nothing of the kind.  The government has never accused, let alone charged, Mr. Lewis with any crime even remotely resembling the claims made by Omega, and this should be sufficient proof to demonstrate the falsity of Omega's allegations at this stage of the proceeding.

now reside in the hands of third parties over whom neither Omega nor this Court exercises control; in fact, some of the documents Omega would have this Court protect as privileged were used as exhibits at trial and all of the documents are in the public domain. Omega is asking this Court to enter an order that is both absurd and unenforceable.

Finally, in addressing "at-issue waiver," Omega miscasts Mr. Lewis's main argument, then mischaracterizes a case on which Omega relies heavily, and finally attempts to sidestep Mr. Lewis's argument that Omega's indemnification claim entitles him to discovery of the work product for which Omega is seeking payment. Although Omega claims that it incurred attorneys' fees solely because of Mr. Lewis, it entered into a deferred prosecution agreement and paid a $500,000 fine for its role in the investment in Azerbaijan; that is sufficient evidence to require thorough discovery and examination of the legal work upon which the indemnification claim is based.

## **ARGUMENT**

### **I.   OMEGA MUST PRODUCE TO MR. LEWIS ALL OF THE DOCUMENTS IT VOLUNTARILY PRODUCED TO THE GOVERNMENT.**

Beginning in early 2005, Omega produced to the USAO certain documents that it believed were subject to a claim of attorney-client privilege or work-product protection.[2] It did so knowing that the documents might well be produced to people or organizations over which it could exercise no control, but did not require the government to place any limitations on the use to which any receiving party could put the documents. The documents now reside, without restrictions, in the hands of third parties over whom neither Omega nor this Court exercise control.[3] It is absurd for Omega to argue that the documents should be protected by any form of privilege.

---

[2] Consistent with Omega's general approach of overstatement and misdirection on any issue of importance, Leon Cooperman's statement to the USAO that he had instructed his attorneys to waive the attorney-client privilege and give the USAO "everything they ask for," because "innocent people have nothing to hide," turns out to be hyperbole. In fact, Omega negotiated significant limitations on the privileged documents it produced, and continued to withhold as privileged large volumes of documents called for by the subpoena with which it was served. See Thompson 6/9/09 Aff. Ex. R ¶ 2.

[3] Indeed, some of the documents have been used by those third parties (with Omega's actual consent) in defense of criminal charges.

Omega suggests that it made this production in pursuit of common legal interests it shared with the government (Omega Opp. Br. at 20 n.12), but this is pure fiction. Unlike a true "Common Legal Interest Agreement" (or the agreement in the case upon which Omega primarily relies in its legal argument on this subject), the agreement between Omega and the government is conspicuously silent concerning any "common legal interests" shared by Omega and the government. Compare Thompson 6/9/09 Aff. Ex. R with In re The Leslie Fay Cos., Inc. Securities Litigation, 161 F.R.D. 274, 278-79 (S.D.N.Y. 1995). Leon Cooperman -- Omega's founder and CEO -- admitted this in January 2006 when he told the USAO "I have been made to understand that you may feel we have been less than fully cooperative with your investigation." Thompson 6/9/09 Aff. Ex. B at 1. Lest there be any residual doubt as to the supposed "common interests" of Omega and the government, we refer the Court to the deferred prosecution agreement between Omega and the government whereby Omega paid a $500,000 penalty for its role in Azerbaijan. Thompson 8/3/09 Aff. Ex. A.

Omega also suggests that it modeled its "limited waiver" agreement with the government on the Leslie Fay decision, but this argument does not withstand even minimal scrutiny. The agreement in Leslie Fay specifically recited that the government and the producing party were pursuing common legal interests, which was plainly not the case here. Moreover, according to the Leslie Fay opinion, that agreement specifically stated that the production of documents ("pursuant to [the parties'] common interests") was "not meant to waive any attorney-client privilege or work-product protection to which those documents may be entitled." Id. Omega's agreement with the government stated the *exact opposite*: "To the extent Omega discloses or permits disclosure of documents and information pursuant to this Agreement, it is hereby understood and agreed that by so doing ***Omega would waive the protection of the attorney-client privilege and the work product doctrine applicable [to the documents disclosed]***." Thompson 6/9/09 Aff. Ex. R at ¶ 3 (emphasis added). The two agreements are not comparable, and Leslie Fay does not support Omega's privilege claim.

Perhaps most importantly, Omega's arguments on this issue ignore the simple fact that all of the documents produced to the government now reside in the hands of third parties over whom neither Omega nor this Court exercises control. The agreement between Omega and the government

-4-

placed no limitation on what the government could do with the documents beyond the limitations of Fed. R. Crim. P. 6(e), and when the government disclosed the documents to defendants in the criminal case, the documents entered the public domain. Like other Rule 6(e) materials, the documents lost any protection of confidentiality when they were produced.

II.  **OMEGA MUST PRODUCE TO MR. LEWIS ALL PRIVILEGED DOCUMENTS AND INFORMATION RELATING TO THE UNDERLYING INVESTMENT TRANSACTION AND ALL OTHER LEGAL WORK FOR WHICH OMEGA BILLED MR. LEWIS OR PHAROS.**

Mr. Lewis argued in his opening brief that he is entitled to disclosure of certain documents and information prepared by law firms including Schulte and Weil because (1) Omega voluntarily shared with Pharos legal services in connection with the investment and (2) Omega caused Pharos to pay for such legal services.[4] Significantly, Mr. Lewis was the lead representative of both Omega and Pharos in connection with the investment, and Omega has admitted that it authorized him to receive legal advice on its behalf knowing that he was also acting for Pharos at the same time. Moreover, the letter agreement between Mr. Cooperman and Mr. Lewis relating to the operation of Pharos specifically states that the two entities would share legal counsel and Pharos would pay Omega for such shared services.[5] Omega cannot credibly deny that Schulte acted as general fund counsel to Pharos from 1997 through September 1998.[6] All of this demonstrates that Omega understood that there was a joint representation and had no expectation of privacy vis-a-vis Mr. Lewis.[7] Under these circumstances, the law does not recognize claims of privilege like those asserted by Omega.

---

[4] The same principle requires production of privileged information through 2001, because Mr. Lewis -- as a beneficiary of Omega's deferred compensation plan -- was billed and paid for a share of the legal fees paid by Omega in connection with the investment. Privilege claims belong to the beneficiaries of a deferred compensation plan. See e.g., In re Long Island Lighting Co., 129 F.3d 268, 271-72 (2d Cir. 1997).

[5] Omega's attempt to characterize the agreement as merely providing generically for "overhead" is more alchemy; the agreement specifically states that Omega would "cover . . . any legal . . . expenses of running your business that are not specifically allocated to and paid by your investors . . . ." Compare Omega Opp. Br. at 17 with Thompson 6/9/09 Aff. Ex. D ¶2(d)(ii).

[6] Subsequent to the filing of the motion, Omega produced additional documentation reflecting Schulte's self-declared role as Pharos "fund counsel" including records of substantial payments to Schulte by Pharos. Thompson 8/3/09 Aff. Ex. C. In light of this documentation, Omega's attempt to characterize Schulte's role as extremely limited (Omega Opp. Br. at 16) is mystifying.

[7] There is no privilege with respect to communications to which Mr. Lewis was a party, but Omega and Schulte continue to withhold such documents. See, e.g., Thompson 8/3/09 Aff. Ex. B, for examples of such communications.

As it did in addressing Mr. Lewis's arguments concerning "limited waiver," Omega responded to this argument with misdirection and deceit. Omega claimed (1) that Schulte was not engaged by Pharos and "did not provide legal services to Pharos in 1998" (Omega Opp. Br. at 16); (2) that neither Schulte nor Weil represented Pharos entities in the Azeri transaction ("or, in the case of Weil, at all") (id.); and (3) that Pharos did not contribute to the payment of Schulte's fees for the Azeri transaction. On this last point, Omega even disputed that Omega employees made payments from Pharos accounts, accusing Mr. Lewis of being "highly misleading" ("to put it charitably"). Omega Opp. Br. at 17-18. It is now clear that Omega knew when it made these arguments to this Court that each of these positions was incorrect.

First, documents in the possession of Omega and Schulte show plainly that Schulte provided "legal services to Pharos in 1998." Those documents include:

* Pharos bank records (maintained by Omega and retained by Omega upon Mr. Lewis's departure from Omega in 1998) showing that Omega employees caused Pharos to make payments to Schulte for legal services in March, June, and September 1998, at least two of which are clearly for work performed in 1998.[8] Thompson 8/3/09 Aff. Ex. E.

* A November 25, 1998 letter from the Schulte partner responsible for the Omega relationship to Mr. Lewis enclosing an invoice for work performed by Schulte for Pharos. The invoice is for work performed for Pharos in August and September 1998. The Schulte partner concludes the letter by saying "I look forward to continuing to work with you." Thompson 8/3/09 Aff. Ex. F.

* Detailed time records relating to Schulte work in 1998 billed through Omega reflects work performed by Schulte lawyers on "inv. Mgmt. agmt. Between Pharos Cap. Mgmt. and Columbia" in April, work on "Columbia agmt." (a Pharos responsibility) in April, work on AIG investment (a Pharos client) in June, and an entire Pharos billing matter number under the Omega client number that was opened by Schulte in 1996. Thompson 8/3/09 Aff. Ex. G.

Second, documents in the possession of Omega (but only recently provided to Mr. Lewis) show plainly that both Schulte and Weil represented Pharos entities in connection with the Azeri transaction. Those documents include the detailed time records described above regarding Schulte's

---

[8] Omega's denials concerning (i) its employees' roles in Pharos's finances and (ii) Pharos's payment of pro rata shares for legal fees in 1998 are particularly disturbing because we identified for Omega's counsel on more than one occasion the Omega employees responsible for handling Pharos's financial affairs in 1998. Because Omega is apparently determined not to provide any evidence to this Court on this issue, we are providing the Affirmation of Dennis Shelhorse attesting to these facts. Thompson 8/3/09 Aff. Ex. D.

work plus a number of other documents -- including invoices, Omega internal documents, and Weil billing records -- showing that Weil performed legal work for Pharos, Omega billed Pharos and processed payments for that work, and Pharos paid Weil directly for some of that work. Thompson 8/3/09 Aff. Ex. H. These documents provide irrefutable evidence that Schulte and Weil represented Pharos entities in connection with the Azeri transaction.

Third, it is clear that Omega billed the Pharos entities a pro rata portion of the legal fees incurred in connection with the investment in Azerbaijan, and that Pharos paid those fees. Omega no longer denies Pharos's pro rata payments to firms such as Weil, Von Meiss Blum, and Cleary Gotlieb. See Omega Opp. Br. at 17. Omega claims that this was not the case with Schulte, or -- more precisely -- Omega states that Mr. Lewis has offered no evidence to show that this was the case.[9]

On July 13, 2009 -- one week after it told this Court that Schulte had not provided legal services to Pharos, and that Pharos had not paid Schulte for legal services in 1998 -- Omega produced Pharos financial records that it had withheld from Mr. Lewis for years. Recognizing that the records reflected payments to Schulte for legal services provided in 1998, Omega's counsel attempted to "spin" the records of payment, claiming that two of the payments related to work prior to 1998 and continuing: "The third is for only $5,6201.61, a figure that (even assuming it relates to 1998 legal services) cannot represent payment by Pharos of a *pro rata* share of Schulte's fees for this period and more likely reflects payment for some limited work done by that firm." Thompson 8/3/09 Aff. Ex. I. Omega has thus admitted that it had misled this Court a week earlier by stating that Schulte did not work for Pharos in 1998.

What is more, the $5,6201.61 payment appears to be a pro rata payment for Schulte's legal work on Azerbaijan up to that time, as it represents approximately 17% of the total fees charged by Schulte in connection with Azerbaijan through August 1998, according to Schulte's (heavily redacted) detailed billing records. Pharos invested approximately 17% of the total amount of money

---

[9] This is more gamesmanship by Omega. Omega and Schulte have refused to provide full discovery on this issue to this day. They possess the records of Schulte's bills, when they were paid, and who paid them, and Mr. Lewis does not. Omega should not be permitted to withhold evidence and then claim that because the evidence has not been produced by Mr. Lewis it does not exist.

invested through Omega and Pharos ($25 million/$150 million). Only Omega can confirm with certainty that the $5,6201.61 payment was actually a payment for work done by Schulte relating to Azerbaijan, as only Omega has access to the detailed records showing the expense allocation to the various investor accounts. Despite repeated requests for that information, Omega will not produce it. On its face, however, it certainly appears that the $5,6201.61 payment is in fact a pro rata payment for Schulte's work on Azeri matters through August 1998.[10]

### III. OMEGA HAS PUT PRIVILEGED INFORMATION SQUARELY "AT ISSUE."

#### A. Omega Has Made Advice of Counsel the Central Issue in This Case and Thus Has Waived Privilege.

Omega argues that it has not placed privileged information "at issue" because Mr. Lewis can obtain the facts concerning Omega's knowledge of Azeri corruption[11] directly from Omega's personnel and thus he need not invade privilege to accomplish this goal. This argument fails for a number of reasons.

First, Omega ignores the rule of one of the key cases upon which it relies, Pereira v. United Jersey Bank, Nos. 94 Civ. 1565, 94 Civ. 1844, 1997 WL 773716 (S.D.N.Y. Dec. 11, 1997), that privilege is waived when the withholding party's counsel "played a substantial and significant role in formulating the actions taken . . ." Id. at *6. In Pereira, Judge Preska found that UJB had put privileged information "at issue" by asserting that it acted in good faith and did not know of an account holder's check-kiting scheme. Because the bank's counsel played a critical role in responding to the situation, "fairness require[d] that the [plaintiff] be allowed to inquire into every aspect of the advice given by counsel . . . ." Id. at *6. Pereira is directly on point – Omega asserts that it entered into the Azeri investment in good faith and without knowledge of Kozeny's financial relationship with Azeri officials, and Omega's lawyers (both inside and outside counsel) played a

---

[10] Whether Pharos paid a pro rata share of the fees charged by Schulte to Omega or not, it is indisputable that Pharos paid for legal services shared with Omega in connection with Azerbaijan pursuant to the 1997 agreement.

[11] Omega concedes that "facts" are not privileged, and thus any factual information Omega conveyed to counsel or counsel conveyed to Omega must be produced to Mr. Lewis. However, Omega has refused to provide any such information, nor has it appropriately identified such information on a privilege log.

-8-

critical role in analyzing and documenting the transaction and in formulating Omega's response when privatization did not go forward.[12]

Second, the information Mr. Lewis needs to defend himself against Omega's spurious charges is not simply "what Omega knew and when it knew it" about Azeri corruption, as Omega contends. Rather, the specific advice Omega's counsel provided on the FCPA and its application to the Azeri investment is critical to Mr. Lewis's defense. Mr. Lewis sought and received FCPA advice from counsel as part of his responsibilities to Omega in connection with the investment, disclosing his understanding of Kozeny's financial relationship in the process. Thus, the crucial questions of why and on what legal basis Omega felt comfortable initiating and maintaining the investment can only be answered by examining the advice provided by counsel and communications between Omega and counsel. If, as Mr. Lewis believes, Omega was advised that the FCPA did not apply so long as Omega's funds were not used to pay Azeri officials, Omega will be unable to establish several critical elements of its claims, including reliance and causation.

Third, Omega claims that Mr. Lewis put advice of counsel at issue by way of defense (Omega Opp. Br. at 7), but this is simply incorrect. Omega asserted in the Complaint that Mr. Lewis led the investment (Compl. ¶ 12), counsel was engaged to provide FCPA advice (Compl. ¶ 35e), and Mr. Lewis then represented that there were no FCPA violations (Compl. ¶ ¶ 33, 34). What counsel knew, and what it advised Mr. Lewis and Omega, is put squarely at issue by the Complaint.

Mr. Lewis's request for information is targeted, narrowly tailored, and absolutely necessary in order to defend against the Omega's allegations. Omega put its knowledge of the corruption at issue; it cannot now fairly refuse to provide essential information to Mr. Lewis. Omega should be compelled to produce all communications with inside and outside counsel concerning the investment, including application of the FCPA, the decision to serve on the Board of Oily Rocks USA as a

---

[12] Pereira also demonstrates the fallacy of Omega's argument that Mr. Lewis has sought through his own pleadings to put Omega's privileged information "at issue;" in Pereira, UJB was found to have put legal advice "at issue" by claiming good faith and an absence of knowledge, which is precisely what Omega has done here.

mechanism to insulate Board members from Kozeny's relationships, and Omega's subsequent investigation following the failure of the investment.

**B.    Omega's Indemnification Claim Places Privileged Information at Issue.**

Omega argues that Mr. Lewis cannot obtain unredacted attorney invoices, time records, and other protected materials underlying the indemnification claim because redacted information is sufficient to assess the reasonableness of the fees for which indemnification is sought.[13]  Such a limitation is wholly insufficient where, as here, it is not merely the reasonableness of the fees at issue but whether Omega can even establish causation.  It is highly likely that the government investigations were focused on the knowledge and conduct of Omega personnel other than Mr. Lewis.  Mr. Lewis is plainly entitled to explore such matters in discovery, and the relevant information will only be contained in materials prepared by or transmitted to Omega by counsel responsible for defending the investigations.

## CONCLUSION

For the foregoing reasons, Defendant Clayton Lewis respectfully requests that the Court grant the within Motion to Compel Discovery.

DATED:  August 3, 2009                                        Respectfully submitted,

**LOWENSTEIN SANDLER PC**

By:_____/s/ R. Scott Thompson__
    R. Scott Thompson (RT-6750)
    Matthew M. Oliver (MO-2852)
    65 Livingston Avenue
    Roseland, New Jersey 07068
    973.597.2500
    Attorneys for Clayton Lewis

---

[13]  Omega also argues that because it has only sought leave to assert the indemnification leave (which leave has not yet been granted), argument concerning the impact of such a claim is not ripe.  Accordingly, and in light of Omega's disavowal of any reliance on the discovery rule or the doctrine of equitable tolling and its claim that the issue has not been raised (Omega Opp. Br. at 10 and n.5), we will forego further argument concerning "at-issue waiver" related to these issues at this time.