**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

| | |
|---|---|
| **OMEGA ADVISORS, INC.,** | ) |
| **OMEGA CAPITAL PARTNERS, L.P.,** | ) |
| **OMEGA CAPITAL INVESTORS, L.P.,** | ) |
| **OMEGA OVERSEAS PARTNERS, LTD.,** | ) |
| **PINE STREET INVESTMENT, LTD.,** | ) |
| **OMEGA GROUP HOLDINGS, LTD.,** | ) |
| **TELOS FINANCE, LTD.,** | ) |
| **BABSON INVEST, S.A.,** | ) |
| **CONAK INTERNATIONAL, INC.,** | ) |
| **OSSIAN OVERSEAS, LTD.,** | ) |
| **HILGORE OVERSEAS, INC.,** | ) |
| **SHIRETON FINANCIAL CORP.,** | ) **C.A. No.:  06-CV-834 (NRB)** |
| **PINFORD PORTFOLIO INC.,** | )      **ECF CASE** |
| **CLIFFTOP INVEST, LTD.,** | ) |
| **KAYS HOLDINGS, S.A.,** | ) **AMENDED COMPLAINT** |
| **RENO FINANCIAL INC.,** | ) |
| **HELENDALE TRADING CORPORATION,** | ) |
| **and PENASCO BUSINESS INC.** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) **JURY TRIAL DEMANDED** |
| **v.** | ) |
| | ) |
| **CLAYTON LEWIS,** | ) |
| | ) |
| **Defendant.** | ) |

_____)

Plaintiffs Omega Advisors, Inc., Omega Capital Partners, L.P., Omega Capital Investors,

L.P., Omega Overseas Partners, Ltd., Pine Street Investment, Ltd., Omega Group Holdings, Ltd.,

Telos Finance, Ltd., Helendale Trading Corporation, Babson Invest, S.A., Conak International,

Inc., Pinford Portfolio Inc., Ossian Overseas, Ltd., Hilgore Overseas, Inc., Reno Financial Inc.,

Shireton Financial Corp., Clifftop Invest, Ltd., Kays Holdings, S.A., and Penasco Business Inc.

(collectively "Omega"), by their undersigned counsel, Baach Robinson & Lewis PLLC, as and

for their Amended Complaint against defendant Clayton Lewis ("Lewis"), hereby allege as follows:[1]

## NATURE OF ACTION

1.    This action concerns a scheme by Lewis, formerly the head of Omega's Emerging Markets Group, to induce Omega to invest in the privatization of state-owned assets of the Republic of Azerbaijan and to maintain such investment while concealing from Omega corrupt arrangements he had entered into with the promoter of the investment to defraud Omega and misuse its funds.

2.    Lewis represented to Omega that the funds it provided would be invested exclusively in financial instruments validly issued by the Azeri government for use in auctions of state-owned enterprises and purchased from disinterested third parties at prevailing market rates. Lewis also represented to Omega that the investment would comply with all applicable Azeri and U.S. laws, including, specifically, the Foreign Corrupt Practices Act (FCPA).

3.    The reality was, in fact, very different.  Lewis had entered into a corrupt and fraudulent conspiracy with the promoter of the transaction whereby the promoter paid Lewis millions of dollars worth of bribes and Lewis agreed to conceal from Omega that some of its funds were to be misused and misapplied by the promoter for his own purposes.  In particular, contrary to the clear and express terms of the agreements that governed the investment, Omega's funds were used (i) to pay bribes to Azeri officials, and (ii) to offload the promoter's own inventory of Azeri financial instruments to Omega at a massive markup.

---

[1] In light of the Court's Order of February 17, 2010, Plaintiffs have revised the present Amended Complaint to include more particularized allegations regarding, *inter alia*, the specific investments of and damages to each plaintiff as a result of Defendant's wrongdoing.  Plaintiffs reserve the right to further amend these allegations, if necessary, after the completion of discovery in this action.

4.      Omega is a highly reputable group of investment funds in the United States and would never have invested knowingly in a corrupt scheme involving illegal payments to foreign officials, as Lewis well knew.  Omega's founder, Leon G. Cooperman, is a former partner of Goldman Sachs and has an unblemished record in forty years in the securities markets.  Although Lewis represented to Omega and others both at the time and for years afterward, including multiple times under oath, that he had not been aware of any bribes, Lewis acknowledged in pleading guilty to federal felony corruption charges in 2004 his awareness of bribes paid to Azeri officials prior to and during the course of the investment.

5.      Nor would Omega have willingly entered into a transaction whereby its funds were used to purchase the promoter's own securities at a huge markup.  On the contrary, the investment agreements specifically prohibited markups and sales to Omega out of the promoter's own inventory, and these prohibitions were known by Lewis to be fundamental to the investment for Omega.

6.      As a result of the fraudulent inducement and Lewis's other wrongful acts, Omega was defrauded, overpaid for the securities it purchased, lost virtually all of the value of its investment, and suffered additional losses to its business and property.

7.      In connection with his fraudulent scheme, Lewis accepted bribes personally, took secret profits at Omega's expense, misapplied and misappropriated Omega's funds for his own purposes, and conspired and assisted in the fraudulent misuse of Omega's investment.

8.      This action alleges that Lewis committed fraud, breaches of contract, and breaches of fiduciary duty resulting in damages to Omega in excess of $475 million, and that Lewis, in an effort to shield himself from liability for his actions, made fraudulent transfers of assets to trusts of which he and members of his family are the beneficiaries.  This action also

seeks disgorgement of bribes, secret profits, misappropriated funds, and other monies for which Lewis is liable to account to Omega, and indemnification for certain costs incurred by Omega as the direct and inevitable result of Lewis's wrongdoing.

## JURISDICTION AND VENUE

9.    Subject matter jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1332 and 1367.  The citizenship of the parties is diverse, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

10.    Venue in this Court is proper under 28 U.S.C. § 1391(a).

## PARTIES AND OTHER RELEVANT PERSONS

### Plaintiffs

11.    Omega Advisors, Inc. ("Omega Advisors") is a Delaware corporation with its principal place of business in New York, New York.  Omega Advisors is a registered investment advisor.

12.    Omega Capital Partners, L.P. ("Omega Capital Partners") is a Delaware limited partnership whose principal place of business is in New York, New York.  Omega Capital Investors, L.P. ("Omega Capital Investors") is a Delaware limited partnership with its principal place of business in New York, New York.  Omega Overseas Partners, Ltd. ("Omega Overseas Partners") is incorporated under the laws of the Cayman Islands, and its principal place of business is in Hamilton, Bermuda.  Omega Capital Partners, Omega Capital Investors, and Omega Overseas Partners (collectively, the "Omega Funds") are funds that are advised by Omega Advisors.  Each entity committed its funds to be invested in financial instruments issued by the Republic of Azerbaijan, through the entities listed in Paragraphs 13 and 14, for use in the privatization of state-owned assets of the Republic of Azerbaijan.

4

13.    Pine Street Investment, Ltd. ("Pine Street"), Omega Group Holdings, Ltd. ("Omega Group Holdings"), Pinford Portfolio Inc. ("Pinford"), Telos Finance, Ltd., ("Telos"), and Helendale Trading Corporation ("Helendale") (collectively, the "Omega Investment Companies") are British Virgin Islands limited companies with registered offices in Tortola, British Virgin Islands, and principal places of business in Baku, Azerbaijan.  They each were formed on behalf of Omega Advisors and the Omega Funds for the purpose of acquiring and holding (through the wholly owned subsidiaries listed in Paragraph 14) financial instruments issued by the Republic of Azerbaijan for use in the privatization of state-owned assets of the Republic of Azerbaijan.

14.    Ossian Overseas, Ltd. ("Ossian"), Shireton Financial Corp. ("Shireton"), Babson Invest, S.A. ("Babson"), and Penasco Business Inc. ("Penasco") are British Virgin Islands corporations with registered offices in Tortola, British Virgin Islands, and principal places of business in Baku, Azerbaijan.  Hilgore Overseas, Inc. ("Hilgore") and Reno Financial Inc. ("Reno") are Belize corporations with registered offices in Belize City, Belize, and principal places of business in Baku, Azerbaijan.  Conak International Inc. ("Conak") and Kays Holdings, S.A. ("Kays") are Bahamas corporations with registered offices in Nassau, Bahamas, and their principal places of business in Baku, Azerbaijan.  Clifftop Invest, Ltd. ("Clifftop") is a Grenada corporation, with a registered office in St. George's, Grenada, and its principal place of business in Baku, Azerbaijan.  These companies (collectively, the "Omega Holding Companies") are special purpose entities formed to acquire and hold (as nominees and for the benefit of the parent companies listed in paragraph 13) financial instruments issued by the Republic of Azerbaijan for use in the privatization of state-owned assets of the Republic of Azerbaijan.  Omega Advisors and the Omega Funds are referred to collectively herein as "Omega," and, where context

requires, a reference to "Omega" may include reference to the Omega Investment Companies and the Omega Holding Companies.

15.     The Omega Investment Companies own the Omega Holding Companies as follows:

a.      Plaintiff Omega Group Holdings owns Plaintiffs Clifftop, Hilgore, Ossian, and Shireton;

b.      Plaintiff Pine Street owns Plaintiffs Babson and Conak;

c.      Plaintiff Pinford owns Plaintiff Reno;

d.       Plaintiff Helendale owns Plaintiff Penasco; and

e.      Plaintiff Telos owns Plaintiff Kays.

### **Defendant**

16.     Upon information and belief, Defendant Lewis is a citizen and resident of the State of Washington.  From January 1995 through August 1998, Lewis was a senior employee of Omega Advisors and a partner in the Omega Funds and acted as an investment advisor to Omega.  At all relevant times hereto, until the termination of his employment on or about August 31, 1998, Lewis was the head of the Emerging Markets Group within Omega, a group that he had started and developed.  In the three years that he worked at Omega, Lewis was paid more than $30 million in compensation.

17.     Lewis pleaded guilty before the Honorable Naomi Reice Buchwald of the United States District Court for the Southern District of New York on February 10, 2004, to a Superseding Information (the "Information") charging that he violated the FCPA and conspired to violate the FCPA in relation to his conduct described herein.  (A true and accurate copy of the transcript of Lewis's plea allocution in the federal corruption case is attached hereto as Exhibit

A.)  As described below, until that time, Lewis vehemently denied, orally, in writing, repeatedly, and under oath, any knowledge of or involvement in corrupt practices.  Indeed, his denials of such knowledge before a Grand Jury in New York County led to a separate conviction in the New York Supreme Court for perjury.  (A true and accurate copy of Lewis's plea allocution in the state perjury case is attached hereto as Exhibit B.)

18.    At all times relevant hereto, Lewis was also the managing principal of Pharos Capital L.P. ("Pharos"), a Delaware limited partnership.  Lewis operated Pharos as a parallel investment fund to Omega, concentrating on emerging market investments.  At all times relevant to the allegations herein, Pharos had approximately $170 million under management.

## Other Persons

19.    Viktor Kozeny was born in Czechoslovakia and is, upon information and belief, a citizen of the Republic of Ireland and a resident of the Bahamas.  At all times relevant to the allegations herein, Kozeny was the head of, or otherwise controlled, various investment companies, including Oily Rock Group, Ltd. ("Oily Rock") and Minaret Group, Ltd. ("Minaret").

20.    Kozeny has been charged with fraud in New York County and violations of the FCPA in the Southern District of New York in connection with his relationship with the Azeri officials.  He is currently residing in the Bahamas and contesting proceedings for his extradition to the United States.  As set forth herein, Kozeny promoted the investment opportunity and presented it to Omega and to Lewis.

21.    Oily Rock is a British Virgin Islands corporation with its principal place of business in Baku, Azerbaijan.  Upon information and belief, Kozeny directed and controlled the operations and decisions of Oily Rock.

22.     Minaret is a British Virgin Islands corporation with its principal place of business in Baku, Azerbaijan.  Upon information and belief, Kozeny directed and controlled the operations and decisions of Minaret.

## FACTS

### The Privatization Program

23.     The Republic of Azerbaijan ("Azerbaijan") is a Central Asian state on the Caspian Sea.  Formerly a communist republic within the Soviet Union, Azerbaijan has been an independent sovereign state since 1991.  At all times relevant to the allegations herein, President Heydar Aliyev ruled Azerbaijan.

24.     In 1995, Azerbaijan began its program to privatize its larger state-owned enterprises ("Privatization Program").  Azerbaijan's State Property Committee ("SPC") was in charge of administering the Privatization Program.

25.     The planned Privatization Program was substantially similar to programs that had been implemented in other former Eastern Bloc states, including Czechoslovakia and Russia. Privatization programs have been viewed as critical to the economic viability of post-Soviet East Bloc states, and such programs have been supported actively by the United States and international organizations, including the International Monetary Fund, the World Bank, and the European Bank for Reconstruction and Development.

26.     The Azeri Privatization Program was structured to privatize state-owned enterprises through an auction process at which interested bidders would offer cash or certain financial instruments, commonly known as "Vouchers," for shares in the enterprises to be sold. The SPC was to reserve a certain number of shares in each enterprise to be privatized for the employees of the enterprise and to auction a certain number of shares for Vouchers and the

balance for cash. It was generally believed in the investment community that significant strategic Azeri state-owned enterprises would be sold pursuant to the Privatization Program, although the timing and ultimate price to be paid were uncertain.

27.    Vouchers were bearer instruments distributed by the Azeri government as a booklet of four coupons at no cost to each Azeri citizen and were freely transferable.

28.    Azeri law permitted foreigners to own and use Vouchers to bid for shares of companies being privatized, but foreigners could exercise their Vouchers only in combination with other financial instruments called Options. Options were essentially a tax on foreigners who wished to participate in the Privatization Program, and they were issued at official government prices by the SPC, which registered the Options and their owners. Only registered owners could exercise their Options to bid in privatization auctions.

### Kozeny's Scheme to Acquire Azeri State-Owned Enterprises

29.    For reasons unknown to Omega, Kozeny claims that he entered into corrupt arrangements with officials of the Republic of Azerbaijan in connection with the Privatization Program in or around 1997, prior to bringing the investment to the attention of Omega.

30.    At around the same time, Kozeny established Oily Rock as a corporate vehicle to acquire Vouchers and Options. He also established Minaret to provide a range of services in Azerbaijan, including investment banking and custodial services.

31.    In 1997, Kozeny began purchasing significant quantities of Vouchers and Options. Kozeny purchased approximately 1,620,000 Vouchers. Concurrently, he also purchased approximately 15,727,000 Options, for which he paid an average price of approximately $0.39 per Option.

**The Fraud Against Omega**

32.     Kozeny approached certain U.S. investors, ostensibly to obtain additional funds to purchase larger quantities of Vouchers and Options and thereby to increase the chances of obtaining a controlling share of certain Azeri enterprises upon their privatization, most significantly, SOCAR, the state-owned oil company.

33.     In February 1998, Aaron Fleck, an acquaintance of Omega CEO Leon Cooperman, approached Mr. Cooperman to solicit Omega as a potential investor in Kozeny's investment scheme. Since Mr. Cooperman's specialty was domestic equities and he was not experienced in emerging market investments, he suggested that the acquaintance contact Lewis who ran Omega's Emerging Markets Group.

34.     Kozeny met initially with Lewis's assistants and then with Lewis and described his plan to acquire Azeri state-owned enterprises. Over the next few months, Lewis met repeatedly with Kozeny and traveled to Baku, Azerbaijan, to meet with certain of the Azeri officials.

35.     According to Lewis's plea allocution, during such meetings — and before Omega made its investments — Kozeny indicated to Lewis that he had entered into a corrupt relationship with the Azeri officials whereby the Azeri officials were given a financial interest in the privatization of Azeri state-owned enterprises.

36.     It is now clear, as described in greater detail below, that Kozeny offered to Lewis and Lewis accepted financial inducements unknown to his employer, Omega, at this time. These financial inducements were bribes given by Kozeny to Lewis to ensure his acquiescence in Kozeny's scheme to corrupt Azeri officials and defraud Omega. These bribes were worth millions of dollars.

10

37.    Lewis determined to solicit Omega's investment without disclosing to Omega or any of its officers, agents, or employees either Kozeny's statements concerning corruption or the financial inducements he provided to Lewis.  Lewis deliberately chose not to disclose these matters because he knew that if they were known, Omega would not have made any investment in Azeri privatization.

38.    In order to induce Omega to invest, Lewis represented to Omega that investment in the privatization of Azeri state-owned enterprises was a legitimate investment opportunity that would be entirely compliant with U.S. and Azeri law, including the FCPA specifically, and concealed from Omega his knowledge of Kozeny's claims of a corrupt relationship with the Azeri officials.  Although he was not providing legal advice to Omega, Lewis knew that payoffs to Azeri officials were absolutely prohibited, and Omega relied on his representations concerning the absence of any known corruption in the deal and the extensive due diligence he purportedly performed in making its decision to invest.  Lewis made similar misrepresentations to a number of other large institutional investors which were important and valued clients of Omega, including General Electric Corp. and Columbia University, as well as to American International Group (AIG).  Again, there is no way that Columbia University or these large companies would have agreed to make an investment tainted by corruption.

39.    In violation of his fiduciary duties to Omega, Lewis abused his position of trust to keep Omega, its investment committee, and other employees from learning of Kozeny's claims to have bribed the Azeri officials.  Indeed, on multiple occasions, Lewis assured Omega and others that the transaction was entirely proper, that the potential for corruption had been diligently considered and evaluated, and that there were stringent protections and controls in

place to preclude Omega's investment from being misused through corrupt payoffs to Azeri officials in violation of the FCPA.

40.     Before making its investment, Omega conducted substantial due diligence on the proposed acquisition, its potential, and its legitimacy by, *inter alia*:

a.     Interviewing persons who were familiar with and expert in investing in Central Asian developing markets;

b.     Sending Omega employees, including Lewis, to Azerbaijan's capital, Baku, to observe Oily Rock's and Minaret's operations, to meet with Azeri government officials to research the Privatization Program and to gain a first-hand understanding of Azerbaijan's situation;

c.     Reviewing Azerbaijan's laws on privatization and foreign investment;

d.     Preparing due diligence memoranda; and

e.     Engaging counsel to ensure, *inter alia*, that the agreements included binding contractual terms that the transaction would be undertaken in accordance with law.

41.     Throughout the due diligence process prior to Omega's investment and thereafter, Lewis deliberately, actively, and repeatedly concealed Kozeny's claims of a corrupt relationship with and payments to the Azeri officials, Kozeny's intention to offload his own inventory of Vouchers and Options to Omega at a massive markup, and Lewis's own acceptance of multi-million-dollar bribes from Kozeny to facilitate and conceal these activities from Omega.

42.     On March 22, 1998, Lewis presented to Omega's investment committee a due diligence memorandum that he had helped prepare and had approved. He made an oral presentation to the committee championing the investment as one of the best opportunities he

had ever seen.  Lewis advised the committee that he intended for the fund that he directed, Pharos, to invest in the proposed acquisition and that he wanted to invest his share of Omega's executive deferred compensation funds as well.  Pursuant to the terms of the deferred compensation fund, all of the Omega executives who participated in the fund were required to participate in the investment on a *pro rata* basis.  Lewis made a further presentation to Omega's executives in order to induce them to invest from the deferred compensation fund where again he did not reveal his knowledge of Kozeny's claims of corruption.

43.    Lewis's due diligence memorandum and oral presentations were materially false and misleading in that they concealed Kozeny's indications of a corrupt relationship with the Azeri officials, Kozeny's intention to misapply Omega's funds, and Lewis's own acceptance of multi-million-dollar bribes from Kozeny.

44.    Omega placed great confidence in Lewis as an experienced and trusted employee. In reliance on Lewis's representations in his due diligence memorandum and oral presentations, Omega's investment committee approved an investment in the Privatization Program of up to 2.5% of the net asset value of its funds, or approximately $125 million, and Lewis obtained approval for the investment of a portion of the deferred compensation fund, approximately $15 million.

45.    Omega insisted on certain contractual protections for the investment. Accordingly, Omega required Oily Rock and Minaret to execute a letter of intent, a co-investment agreement, and a custodian agreement (the "Agreements"), containing express representations and covenants that:

a.    Kozeny and his companies would not violate any laws in their dealings with Omega's investment, specifically including the FCPA and any applicable U.S., Azeri, or other anti-corruption law;

b.    Omega would invest alongside Oily Rock and Minaret but not through them, with Oily Rock and Minaret acting solely as Omega's agent to purchase Vouchers and Options;

c.    Oily Rock and Minaret would not charge Omega any markups or commissions without Omega's express permission; and

d.    Vouchers and Options would not be sold to Omega out of Oily Rock's and/or Minaret's own inventory or entities controlled by them.

All of these terms were fundamental for Omega as Lewis well knew. Mr. Cooperman, a former Goldman Sachs partner with an unblemished 40-year record of both honesty and accomplishment in the securities markets, had absolutely no interest in involving himself or his investors in an investment tainted by corruption, no matter what the prospective returns might be. Similarly, he would have had no interest in involving Columbia University, where he sat on the Board of Overseers of the Graduate School of Business, or any of his other clients or contacts. The provisions against markups and self-dealing were also critical, because the premise of the investment was that Omega and the others would invest alongside Mr. Kozeny and his companies, which had already acquired large positions in Azeri privatization securities, and the "co-investment" approach would allow the consortium to pool its resources toward acquiring a controlling interest in valuable privatized industries. This strategy obviously would not be advanced if the co-investors were merely selling their securities to one another, and Omega and the other investors did not wish to be used as vehicles for Mr. Kozeny to lay off the risk he had

already assumed through his investment and to take a huge profit at their expense by selling them securities he had purchased at a tiny fraction of the cost only months earlier.  Lewis fully understood these objectives.

46.    At the time these Agreements were entered into, Lewis knew that Minaret and Oily Rock could not and would not perform their obligations thereunder, particularly their obligation not to violate any anti-corruption laws, and that the contractual protections that Omega believed it enjoyed were thus illusory.  Yet, he concealed this critical and highly material information from Omega, instead misrepresenting to Omega that, to the best of his knowledge and belief, Kozeny intended to and would abide by the terms of the Agreements.

47.    On or about March 20, 1998, Lewis caused Omega to begin purchasing significant quantities of Vouchers and/or Options.

48.    Through Lewis, Omega purchased 669,131 Vouchers for $59,504,471 and 2,676,557 Options for $66,913,925.   The purchases were made for and on behalf of the Omega Investment Companies, however in practice the actual fund transfers originated from one or more of the Omega Funds and were paid directly to Kozeny's companies or their agents.  Where it is stated herein that one of the Omega Investment Companies made such a purchase, this may therefore indicate a direct transfer from the relevant Omega Fund or Funds on behalf of an Omega Investment Company or Companies.  The specific details of the funds transfers are reflected in Exhibit C, which is attached hereto.

49.    The Omega Investment Companies were owned by the Omega Funds and, in the case of Helendale, its shares were held in a managed account in favor of Beta Equities Inc., a subsidiary of GE Capital.  In some cases, the ownership structure was simple, such that one Omega Fund owned 100% of one Omega Investment Company, as was the case with Omega

15

Capital Partners' ownership of Pine Street.  In other cases, the ownership structure was more complex, as reflected in the diagrams attached hereto as Exhibit D.  The specific allocation of voucher and option purchases as between the Omega Funds was computed with reference to their specific share holding in the Omega Investment Companies and is set forth in the individual trade confirmations, which are attached hereto as Exhibit E.  These trade confirmations set forth the specific allocation of value of each Option and/or Voucher purchase between and among the Omega Funds.

50.     With respect to the allocation of Option and Voucher purchases between the Omega Investment Companies, their purchases can be broken down as follows:

   a.     Plaintiff Omega Group Holdings, which was then known as Omega Baku, purchased 369,626 Vouchers for a total price of $32,310,607 and 1,478,503 Options for a total price of $36,962,575;

   b.     Plaintiff Pine Street purchased 163,365 Vouchers for a total price of $15,256,010 and 653,487 Options for a total price of $16,337,175;

   c.     Plaintiff Pinford purchased 7,886 Vouchers for a total price of $782,100 and 31,548 Options for a total price of $788,700;

   d.     Plaintiff Helendale purchased 49,094 Vouchers for a total price of $4,088,840 and 196,376 Options for a total price of $4,909,400; and

   e.     Plaintiff Telos purchased 79,160 Vouchers for a total price of $7,066,914 and 316,643 Options for a total price of $7,916,075.

51.     Omega's purchases of Options and Vouchers were made between March 20 and July 23, 1998, and specifically on the following dates:

a.    Omega Group Holdings made purchases of Vouchers and Options beginning on March 20, 1998 and ending on June 16, 1998 through 19 trade confirmations, as detailed in the chart below:

| Trade Confirmation | Date of Purchase | Vouchers | Price | Options | Price |
|---|---|---|---|---|---|
| No. 1 | 20-Mar-98 | 9,285 | 668,520 | 0 | 0 |
| No. 2 | 30-Mar-98 | 24,760 | 1,980,800 | 0 | 0 |
| No. 3 | 1-Apr-98 | 24,141 | 1,931,280 | 0 | 0 |
| No. 4 | 2-Apr-98 | 24,760 | 1,980,800 | 0 | 0 |
| No. 5 | 3-Apr-98 | 108,325 | 9,099,300 | 0 | 0 |
| No. 6 | 6-Apr-98 | 30,950 | 2,476,000 | 0 | 0 |
| No. 7 | 6-Apr-98 | 0 | 0 | 888,884 | 22,222,100 |
| No. 8 | 10-Apr-98 | 15,220 | 1,293,700 | 0 | 0 |
| No. 9 | 15-Apr-98 | 0 | 0 | 60,880 | 1,522,000 |
| No. 10 | 14-Apr-98 | 50,945 | 5,043,555 | 0 | 0 |
| No. 11 | 15-Apr-98 | 0 | 0 | 203,780 | 5,094,500 |
| No. 12 | 21-Apr-98 | 0 | 0 | 0 | 0 |
| No. 13 | 29-Apr-98 | 0 | 0 | 0 | 0 |
| No 14 | 29-Apr-98 | 0 | 0 | 0 | 0 |
| No. 15 | 7-May-98 | 62,923 | 6,292,300 | 0 | 0 |
| No. 16 | 7-May-98 | 0 | 0 | 251,692 | 6,292,300 |
| No. 17 | 19-May-98 | 9,874 | 868,912 | 0 | 0 |
| No. 18 | 19-May-98 | 0 | 0 | 39,496 | 987,400 |
| No. 19 | 3-Jun-98 | 0 | 0 | 32,719 | 817,975 |
| No. 20 | 3-Jun-98 | 8,180 | 654,400 | 0 | 0 |
| No. 21 | 10-Jun-98 | 263 | 21,040 | 0 | 0 |
| No. 22 | 16-Jun-98 | 0 | 0 | 1,052 | 26,300 |
| No. 23 | 17-Jun-98 | 0 | 0 | 0 | 0 |
| No. 24 | 17-Jun-98 | 0 | 0 | 0 | 0 |
| No. 25 | 23-Jul-98 | 0 | 0 | 0 | 0 |
| No 26 | 23-Jul-98 | 0 | 0 | 0 | 0 |
| **TOTAL** | | 369,626 | 32,310,607 | 1,478,503 | 36,962,575 |

b.    Pine Street made purchases of Vouchers and Options beginning on March 20, 1998 and ending on June 16, 1998 through 22 trade confirmations, as detailed in the chart below:

| Trade Confirmation | Date of Purchase | Vouchers | Price | Options | Price |
|---|---|---|---|---|---|
| No 1 | 20-Mar-98 | 1,485 | 106,920 | 0 | 0 |
| No 2 | 30-Mar-98 | 3,960 | 316,800 | 0 | 0 |
| No 3 | 1-Apr-98 | 3,861 | 308,880 | 0 | 0 |

17

| Trade Confirmation | Date of Purchase | Vouchers | Price | Options | Price |
|---|---|---|---|---|---|
| No 4 | 2-Apr-98 | 3,960 | 316,800 | 0 | 0 |
| No 5 | 3-Apr-98 | 17,325 | 1,455,300 | 0 | 0 |
| No 6 | 6-Apr-98 | 4,950 | 396,000 | 0 | 0 |
| No 7 | 6-Apr-98 | 0 | 0 | 142,164 | 3,554,100 |
| No 8 | 10-Apr-98 | 2,434 | 206,890 | 0 | 0 |
| No 9 | 15-Apr-98 | 0 | 0 | 9,736 | 243,400 |
| No 10 | 14-Apr-98 | 8,148 | 806,652 | 0 | 0 |
| No 11 | 15-Apr-98 | 0 | 0 | 32,592 | 814,800 |
| No 12 | 21-Apr-98 | 0 | 0 | 38,800 | 970,000 |
| No 13 | 29-Apr-98 | 59,100 | 5,732,700 | 0 | 0 |
| No 14 | 29-Apr-98 | 0 | 0 | 197,628 | 4,940,700 |
| No 15 | 7-May-98 | 44,499 | 4,449,900 | 0 | 0 |
| No 16 | 7-May-98 | 0 | 0 | 177,996 | 4,449,900 |
| No 17 | 19-May-98 | 8,466 | 745,008 | 0 | 0 |
| No 18 | 19-May-98 | 0 | 0 | 33,864 | 846,600 |
| No 19 | 3-Jun-98 | 0 | 0 | 20,624 | 515,600 |
| No 20 | 3-Jun-98 | 5,156 | 412,480 | 0 | 0 |
| No 21 | 10-Jun-98 | 21 | 1,680 | 0 | 0 |
| No 22 | 16-Jun-98 | 0 | 0 | 83 | 2,075 |
| No 23 | 17-Jun-98 | 0 | 0 | 0 | 0 |
| No 24 | 17-Jun-98 | 0 | 0 | 0 | 0 |
| No 25 | 23-Jul-98 | 0 | 0 | 0 | 0 |
| No 26 | 23-Jul-98 | 0 | 0 | 0 | 0 |
| **TOTALS** | | **163,365** | **15,256,010** | **653,487** | **16,337,175** |

c.    Pinford made purchases of Vouchers and Options beginning on May 7, 1998 and ending on June 16, 1998 through 8 trade confirmations, as detailed in the chart below:

| Trade Confirmation | Date of Purchase | Vouchers | Price | Options | Price |
|---|---|---|---|---|---|
| No 1 | 20-Mar-98 | 0 | 0 | 0 | 0 |
| No 2 | 30-Mar-98 | 0 | 0 | 0 | 0 |
| No 3 | 1-Apr-98 | .0 | 0 | 0 | 0 |
| No 4 | 2-Apr-98 | 0 | 0 | 0 | 0 |
| No 5 | 3-Apr-98 | 0 | 0 | | 0 |
| No 6 | 6-Apr-98 | 0 | 0 | 0 | 0 |
| No 7 | 6-Apr-98 | 0 | 0 | 0 | 0 |
| No 8 | 10-Apr-98 | 0 | 0 | 0 | 0 |
| No 9 | 15-Apr-98 | 0 | 0 | 0 | 0 |
| No 10 | 14-Apr-98 | 0 | 0 | 0 | 0 |
| No 11 | 15-Apr-98 | 0 | 0 | 0 | 0 |
| No 12 | 21-Apr-98 | 0 | 0 | 0 | 0 |
| No 13 | 29-Apr-98 | 0 | 0 | 0 | 0 |
| No 14 | 29-Apr-98 | 0 | 0 | 0 | 0 |
| No 15 | 7-May-98 | 7,473 | 747,300 | 0 | 0 |
| No 16 | 7-May-98 | 0 | 0 | 29,892 | 747,300 |

| Trade Confirmation | Date of Purchase | Vouchers | Price | Options | Price |
|---|---|---|---|---|---|
| No 17 | 19-May-98 | 220 | 19,360 | 0 | 0 |
| No 18 | 19-May-98 | 0 | 0 | 880 | 22,000 |
| No 19 | 3-Jun-98 | 0 | 0 | 187 | 4,675 |
| No 20 | 3-Jun-98 | 46 | 3,680 | 0 | 0 |
| No 21 | 10-Jun-98 | 147 | 11,760 | 0 | 0 |
| No 22 | 16-Jun-98 | .0 | 0 | 589 | 14,725 |
| No 23 | 17-Jun-98 | 0 | 0 | 0 | 0 |
| No 24 | 17-Jun-98 | 0 | 0 | 0 | 0 |
| No 25 | 23-Jul-98 | 0 | 0 | 0 | 0 |
| No 26 | 23-Jul-98 | 0 | 0 | 0 | 0 |
| **TOTALS** | | **7,886** | **782,100** | **31,548** | **788,700** |

    d.    Helendale made purchases of Vouchers and Options beginning on June 17, 1998

and ending on July 23, 1998 through 4 trade confirmations, as detailed in the chart

below: and

| Trade Confirmation | Date of Purchase | Vouchers | Price | Options | Price |
|---|---|---|---|---|---|
| No 1 | 20-Mar-98 | 0 | 0 | 0 | 0 |
| No 2 | 30-Mar-98 | 0 | 0 | 0 | 0 |
| No 3 | 1-Apr-98 | 0 | 0 | 0 | 0 |
| No 4 | 2-Apr-98 | 0 | 0 | 0 | 0 |
| No 5 | 3-Apr-98 | 0 | 0 | 0 | 0 |
| No 6 | 6-Apr-98 | 0 | 0 | 0 | 0 |
| No 7 | 6-Apr-98 | 0 | 0 | 0 | 0 |
| No 8 | 10-Apr-98 | 0 | 0 | 0 | 0 |
| No 9 | 15-Apr-98 | 0 | ' 0 | 0 | 0 |
| No 10 | 14-Apr-98 | 0 | 0 | 0 | 0 |
| No 11 | 15-Apr-98 | 0 | 0 | 0 | 0 |
| Ho 12 | 21-Apr-98 | 0 | 0 | 0 | 0 |
| No 13 | 29-Apr-98 | 0 | 0 | 0 | 0 |
| No 14 | 29-Apr-98 | 0 | 0 | 0 | 0 |
| No 15 | 7-May-98 | 0 | 0 | 0 | 0 |
| No 16 | 7-May-98 | 0 | 0 | 0 | .0 |
| No 17 | 19-May-98 | 0 | 0 | 0 | 0 |
| No 18 | 19-May-98 | 0 | 0 | 0 | 0 |
| No 19 | 3-Jun-98 | 0 | 0 | 0 | 0 |
| No 20 | 3-Jun-98 | 0 | 0 | 0 | |
| No 21 | 10-Jun-98 | 0 | 0 | 0 | 0 |
| No 22 | 16-Jun-98 | 0 | 0 | 0 | 0 |
| No 23 | 17-Jun-98 | 21,044 | 1,788,740 | 0 | 0 |
| No 24 | 17-Jun-98 | 0 | 0 | 84,176 | 2,104,400 |
| No 25 | 23-Jul-98 | 28,050 | 2,300,100 | 0 | 0 |
| No 26 | 23-Jul-98 | 0 | 0 | 112,200 | 2,805,000 |
| **TOTALS** | | **49,094** | **4,088,840** | **196,376** | **4,909,400** |

e.    Telos made purchases of Vouchers and Options beginning on March 20, 1998 and

ending on June 16, 1998 through 22 trade confirmations, as detailed in the chart

below:

| Trade Confirmation | Date of Purchase | Vouchers | Price | Options | Price |
|---|---|---|---|---|---|
| No 1 | 20-Mar-98 | 1,618 | 116,496 | 0 | 0 |
| No 2 | 30-Mar-98 | 4,314 | 345,120 | 0 | 0 |
| No 3 | 1-Apr-98 | 4,206 | 336,480 | 0 | 0 |
| No 4 | 2-Apr-98 | 4,313 | 345,040 | 0 | 0 |
| No 5 | 3-Apr-98 | 18,871 | 1,585,164 | 0 | 0 |
| No 6 | 6-Apr-98 | 5,392 | 431,360 | 0 | 0 |
| No 7 | 6-Apr-98 | 0 | 0 | 154,856 | 3,871,400 |
| No 8 | 10-Apr-98 | 2,652 | 225,420 | 0 | 0 |
| No 9 | 15-Apr-98 | 0 | 0 | 10,608 | 265,200 |
| No 10 | 14-Apr-98 | 8,875 | 878,625 | 0 | 0 |
| No 11 | 15-Apr-98 | 0 | 0 | 35,500 | 887,500 |
| No 12 | 21-Apr-98 | 0 | 0 | 5,800 | 145,000 |
| No 13 | 29-Apr-98 | 8,833 | 856,801 | 0 | 0 |
| No 14 | 29-Apr-98 | 0 | 0 | 29,536 | 738,400 |
| No 15 | 7-May-98 | 16,122 | 1,612,200 | 0 | 0 |
| No 16 | 7-May-98 | 0 | 0 | 64,488 | 1,612,200 |
| No 17 | 19-May-98 | 2,136 | 187,968 | 0 | 0 |
| No 18 | 19-May-98 | 0 | 0 | 8,544 | 213,600 |
| No 19 | 3-Jun-98 | 0 | 0 | 7,255 | 181,375 |
| No 20 | 3-Jun-98 | 1,814 | 145,120 | 0 | 0 |
| No 21 | 10-Jun-98 | 14 | 1,120 | 0 | 0 |
| No 22 | 16-Jun-98 | 0 | 0 | 56 | 1,400 |
| No 23 | 17-Jun-98 | 0 | 0 | 0 | 0 |
| No 24 | 17-Jun-98 | 0 | 0 | 0 | 0 |
| No 25 | 23-Jul-98 | 0 | 0 | 0 | 0 |
| No 26 | 23-Jul-98 | 0 | 0 | 0 | 0 |
| **TOTALS** | | **79,160** | **7,066,914** | **316,643** | **7,916,075** |

52.    The options purchased by the Omega Investment Companies were held by Omega

Holding Companies owned by each as follows:

a.    The Options purchased by Plaintiff Omega Group Holdings were held by and

registered with the SPC in the names of Plaintiffs Clifftop, Hilgore, Ossian, and

Shireton;

b.    The Options purchased by Plaintiff Pine Street were held by and registered with

the SPC in the names of Plaintiffs Babson and Conak;

c.     The Options purchased by Plaintiff Telos were held by and registered with the SPC in the name of Plaintiff Kays;

d.     The Options purchased by Plaintiff Pinford were held by and registered with the SPC in the name of Plaintiff Reno; and

e.     The Options purchased by Plaintiff Helendale were held by and registered with the SPC in the name of Plaintiff Penasco.

53.     The specific distribution of the Options purchased by the Omega Investment Companies among the Omega Holding Companies is illustrated in the following chart:

| Omega Investment Company | Omega Holding Company | Number of Options |
|---|---|---|
| **OMEGA BAKU** | Clifftop | 295,503 |
| | Hilgore | 400,000 |
| | Ossian | 400,000 |
| | Shireton | 383,000 |
| | | |
| **PINE STREET** | Babson | 332,000 |
| | Conak | 322,000 |
| | | |
| **PINFORD** | Reno | 31,527 |
| | | |
| **HELENDALE** | Penasco | 196,225 |
| | | |
| **TELOS** | Kays | 316,643 |

54.     Kozeny, through his companies Oily Rock and Minaret, sold at least $20 million of the approximately $60 million in Vouchers from his own inventory and/or at a markup, in a direct fraud on Omega and contrary to the Agreements, with Lewis's acquiescence and/or assistance.  Kozeny, through Oily Rock and Minaret, sold all or virtually all of the approximately 2.7 million Options purchased by Omega from his own inventory and at a huge markup, representing approximately $66 million of Omega's money, in a direct fraud on Omega and

contrary to the Agreements, with Lewis's acquiescence and/or assistance, and with nearly all of the $66 million representing a direct profit to Kozeny and his companies.  Omega paid $25 per Option; Kozeny had paid an average of $0.39 for these Options only months earlier.

55.     The provenance of Omega's Options from Kozeny's companies is evidenced by the corresponding certificates for these Options which, as Omega later learned, indicate their issuance to various Oily Rock subsidiaries in September and October 1997, long before Omega's participation in the investment (and indeed before the Omega Investment Companies or the Omega Holding Companies had even been formed).  The specific provenance of the Options purchased by the Omega Investment Companies and held by the Omega Holding Companies is detailed in the following chart:

| Omega Investment Company | Omega Holding Company | Option Certificate Number | Number of Options | Previous Owner | Date of Original Sale by SPC |
|---|---|---|---|---|---|
| OMEGA BAKU | Clifftop | 136/1 | 45,000 | Boley | 25-Sep-97 |
| | | 152/1 | 80,000 | Gingera | 25-Sep-97 |
| | | 194/1 | 66,000 | Calistoga | 29-Sep-97 |
| | | 194/3 | 4,000 | Calistoga | 29-Sep-97 |
| | | 210/1 | 4,503 | Vilgee | 29-Sep-97 |
| | | 282/2 | 32,000 | Calistoga | 21-Oct-97 |
| | | 297/1 | 64,000 | Delicias | 21-Oct-97 |
| | | | | | |
| | Hilgore | 139/1 | 87,000 | Tenbury | 25-Sep-97 |
| | | 154/1 | 93,000 | Tenbury | 25-Sep-97 |
| | | 168/1 | 30,000 | Tenbury | 25-Sep-97 |
| | | 212/1 | 90,000 | Delicias | 25-Sep-97 |
| | | 299/1 | 100,000 | Waines | 21-Oct-97 |
| | | | | | |
| | Ossian | 170/1 | 127,000 | Durango | 29-Sep-97 |
| | | 211/1 | 93,000 | Tenbury | 29-Sep-97 |
| | | 214/1 | 75,000 | Waines | 29-Sep-97 |
| | | 309/1 | 30,000 | Delicias | 24-Oct-97 |
| | | 311/1 | 75,000 | Waines | 24-Oct-97 |
| | | | | | |
| | Shireton | 160/1 | 56,000 | Preview | 25-Sep-97 |
| | | 164/1 | 37,000 | Calistoga | 25-Sep-97 |
| | | 166/1 | 65,000 | Gingera | 25-Sep-97 |
| | | 208/1 | 50,000 | Boley | 29-Sep-97 |

| Omega Investment Company | Omega Holding Company | Option Certificate Number | Number of Options | Previous Owner | Date of Original Sale by SPC |
|---|---|---|---|---|---|
| | | 213/2 | 20,000 | Durango | 29-Sep-97 |
| | | 295/1 | 50,000 | Vilgee | 21-Oct-97 |
| | | 306/1 | 61,000 | Boley | 24-Oct-97 |
| | | 307/1 | 44,000 | Gingera | 24-Oct-97 |
| | | Total: | 1,478,503 | | |
| | | | | | |
| PINE STREET | Babson | 116/1 | 40,000 | Summer Queen | 25-Sep-97 |
| | | 158/2 | 2,000 | Summer Queen | 22-Sep-97 |
| | | 153/1 | 80,000 | Vilgee | 25-Sep-97 |
| | | 167/1 | 77,000 | Vilgee | 25-Sep-97 |
| | | 296/1 | 97,000 | Tenbury | 21-Oct-97 |
| | | 312/1 | 36,000 | Denis | 24-Oct-97 |
| | | | | | |
| | Conak | 282/1 | 43,000 | Calistoga | 21-Oct-97 |
| | | 172/1 | 64,000 | Waines | 29-Sep-97 |
| | | 173/1 | 215,000 | Delicias | 29-Sep-97 |
| | | Total: | 654,000 | | |
| | | | | | |
| PINFORD | Reno | 150/1 | 31,527 | Calistoga | 25-Sep-97 |
| | | Total: | 31,527 | | |
| | | | | | |
| HELENDALE | Penasco | 114/1 | 20,000 | Durango | 29-Sep-97 |
| | | 128/1 | 77,000 | Summer Queen | 25-Sep-97 |
| | | 202/1 | 99,225 | Preview | 21-Oct-97 |
| | | Total: | 196,225 | | |
| | | | | | |
| TELOS | Kays | 137/1 | 75,120 | Gingera | 25-Sep-97 |
| | | 138/1 | 90,000 | Vilgee | 25-Sep-97 |
| | | 151/1 | 60,000 | Boley | 25-Sep-97 |
| | | 163/1 | 26,000 | Calistoga | 29-Sep-97 |
| | | 293/1 | 60,000 | Boley | 21-Oct-97 |
| | | 294/1 | 5,523 | Gingera | 21-Oct-97 |
| | | Total: | 316,643 | | |

56.    The sale to Omega of Vouchers and Options owned by the Oily Rock subsidiaries listed in the fifth column of the chart in the preceding paragraph constituted a sale out of the inventory of Oily Rock or entities controlled by it in direct contravention of the terms of the co-investment agreement.

57.     Lewis profited directly from the fraud and/or was bribed by Kozeny and/or misapplied Omega's investment by retaining certain of the funds diverted from Omega ostensibly for authorized purchases of Vouchers and Options.

58.     In addition, Lewis received from Kozeny a significant quantity of Options and/or Vouchers and/or other things of value as bribes to induce his participation in the scheme.

59.     Although the following matters were not disclosed by Lewis to Omega, documents that became available to Omega in late 2008 reveal that Lewis entered into agreements with Kozeny, some of them apparently reduced to writing after the fact, to the following effect:

  a.     Kozeny gave Lewis a secret 40% interest in future profits of Minaret from the sale of Omega's Vouchers and Options. (Pursuant to the Co-Investment Agreement, Kozeny's company Minaret was entitled to 10% of Omega's net profit upon sale of its Vouchers and Options. Hence, Lewis received a benefit equivalent to 4% of Omega's potential profit through its privatization investment.) This bribe, worth tens of millions of dollars, was effectuated via a series of secret transactions whereby the 40% interest was gifted to Lewis. Minaret entered into a "Profit Sharing Agreement" conveying the 40% interest in the Co-Investment Agreement profits to a company (Ramsi Holding Corp., a British Virgin Islands company associated with Kozeny, hereinafter "Ramsi") which in turn assigned the benefit of the agreement to its subsidiary (Serenada United Corp., a Panama company, hereinafter "Serenada") whose shares were then gifted to Lewis's holding company (Hortus Limited, a Grenada company, hereinafter "Hortus") (the full set of transactions being referred to hereinafter as the "Serenada transaction" or the

"Profit Sharing transaction").    All of the companies involved were shelf companies domiciled in jurisdictions of convenience whose laws provide for maximum shareholder secrecy.  The parties to the Profit Sharing Agreement and the assignment undertook to each other in writing to ensure that no third party learned of the existence or content of the agreements;

b.    Kozeny offered to Lewis and Lewis accepted millions of dollars worth of Vouchers and/or Options either for no consideration or at prices far below then-prevailing market prices and far below what Omega was then paying.    In particular, Kozeny provided to Lewis the benefit of some 40,000 Vouchers either free or at approximately half of market value and 40,000 sets of Options to match them free (a total value of approximately $6-8 million in aggregate at the time) by placing them into a company (Rimstone Enterprises S.A., a BVI company) also owned by Lewis's holding company Hortus (hereinafter, the "Rimstone transaction");

c.    With the corrupt and wrongful assistance of Kozeny and Minaret, and unbeknownst to Omega, Lewis, or Rimstone acting on Lewis's behalf, "sold" some of his own stock of illicitly obtained Vouchers and Options in or around July 23, 1998 *to Omega*, and specifically to Omega Investment Company Helendale for holding by Omega Holding Company Penasco, at a massive markup, taking a secret profit of $5,105,100.  Helendale was established as an investment vehicle for a managed account operated by Omega Advisors for Beta Equities Inc.  The sale by Lewis to Omega was of 28,050 of the 40,000 Vouchers referred to in part b of this paragraph, along with matching Options, at a price of

$182 for each set of one Voucher and matching set of Options (each Voucher was sold for $82 while each Option was sold for $25, making a total of $182 per Voucher plus four Options). The approximately $5 million profit, which was clearly unauthorized and represented a direct theft from Omega, was transferred through an account of Kozeny's company Minaret, and then a client trust account of Kozeny's lawyers von Meiss Blum, and finally hidden in an account at Hyposwiss Bank in Zurich, Switzerland owned by another shelf company, Nikolski Overseas Ltd., a BVI company (hereinafter "Nikolski") that was also placed into Lewis's holding company Hortus. The payments to Nikolski for Lewis's benefit were made in two traunches on or about September 28, 1998 and November 23, 1998. This set of payments (hereinafter, the "Nikolski transaction") allowed Lewis to use Omega's own money to convert 28,050 of the 40,000 Vouchers and matching Options previously gifted to him by Kozeny into cash; and

d.    With the assistance of Kozeny, Oily Rock, Minaret, and their Swiss attorney, Hans Bodmer of von Meiss Blum and Partners in Zurich (who pleaded guilty to money laundering charges in this Court in connection with Kozeny's bribery and fraud scheme), the shares of Hortus, and thus the assets described in paragraphs a-c of this paragraph, were conveyed into an *Anstalt*, *i.e.*, a trust-like foundation established under the laws of Liechtenstein, for the sole benefit of Lewis during his life, and certain of his family members thereafter. The *Anstalt*, known as the Upside Foundation, was settled by Ramsi (*i.e.*, the same Kozeny-related company involved in the corrupt 40% Profit Sharing transaction with Minaret, as described

above in subparagraph a).  Lewis's brother, William L. Lewis, was designated to manage the trust assets and to be "consulted" by the Trustees in respect of any distributions.

60.    Lewis did not disclose any of the transactions set out in paragraph 59 to Omega as a general matter and more specifically did not disclose them to Omega Advisors, Inc., his employer.

61.    Lewis did not disclose any of the transactions set out in paragraph 59 to anyone at Omega.

62.    Lewis did not disclose any of the transactions set out in paragraph 59 to GE, AIG, or Columbia or to anyone at those entities or to the holding companies and Voucher holding companies set up for purposes of their investments.

63.    Kozeny and Lewis in fact agreed to conceal these transactions from the persons and entities listed in the preceding paragraphs 60 through 62.

64.    Lewis took affirmative and deliberate steps after the fact to conceal and launder the proceeds of the transactions described in paragraph 59.  He conspired with von Meiss Blum attorneys in 1998 and 1999 to set up new shelf companies to receive assets from some or all of the companies described in that paragraph; arranged for assets to be transferred to new companies and accounts managed by a law firm in Cyprus and/or others; and later, in early 2001, removed and/or destroyed original documents reflecting the transactions in paragraph 59 from the files of the Cypriot law firm's offices.

65.    One of Lewis's principal roles in the high-value transactions between Omega and Kozeny and his companies was to monitor and ensure compliance with the Agreements, and in particular the provisions requiring observance of all applicable laws including specifically the

FCPA and the provisions prohibiting Kozeny from selling Vouchers and Options to Omega from his own inventory or at a markup. He was also responsible for determining when, how, and at what prices Omega's funds would be committed and transferred to Kozeny and his companies for Voucher and Option purchases, and it was his duty to ensure, to the best of his ability, the safe conduct and appropriate application of those funds.

66.     By accepting and/or agreeing to accept millions of dollars in value from Kozeny through the transactions described in paragraph 59, Lewis placed himself in a fundamental conflict of interest with respect to the role described in the previous paragraph.

67.     Lewis's acceptance and/or agreement to accept millions of dollars in value from Kozeny through the transactions described in paragraph 59 had the natural and inevitable tendency to influence Lewis to prefer Kozeny's interests over those of Omega.

68.     Indeed, the transactions described in paragraph 59 were intended to—and did—secure Lewis's agreement to conceal from Omega Kozeny's wrongdoing and misapplications of Omega's funds.

69.     Had Lewis come to Omega and proposed entering into the personal transactions with Kozeny described in paragraph 59, Omega would not have permitted him to enter into such transactions, and Lewis knew this to be the case.

70.     In order to remove his assets from the reach of Omega in case his improper conduct was discovered, Lewis transferred approximately $15,000,000 to one or more trusts of which he, his wife, and/or other family members are potential beneficiaries, without consideration. At the time of these transfers of assets, Lewis was fully aware of his frauds, acceptance of bribes, taking of secret profits, and other breaches of fiduciary duty and wrongful acts against Omega. The transfers were effected in an attempt to shield his assets fraudulently

from the victims of his wrongdoing – including Omega – in the event that his participation was discovered.

### Lewis's Departure from Omega

71.     In August 1998, in the face of a financial crisis in Russia, Omega learned that Lewis had incurred significant losses and had materially exceeded his authorized loss limits in connection with other investments he had made on Omega's behalf in Russian financial markets. In addition, Lewis, while on a family vacation, declined to return to Omega to help manage the results of the crisis.  As a result, Omega terminated Lewis's employment.

72.     In November 1998, Lewis and Omega's CEO Lee Cooperman entered into a letter agreement separating the affairs of Omega and Lewis.  As part of that agreement, Omega agreed to pay monies claimed by Lewis from Omega's deferred compensation and deferred incentive programs amounting to more than $5 million.  This payment was made at a time when Omega was unaware of Lewis's role in the defrauding of Omega and corruption of Azeri officials. Omega was unaware because Lewis had consistently lied and concealed his conspiracy with Kozeny and his massive wrongdoing and corruption.

### Discovery of the Markup Fraud

73.     In October 1998, Omega received a publication sponsored by the European Union, which reported on the status of the Azeri Privatization Program.  Omega learned from that publication that Azerbaijan had issued a total of 18 million Options.  Of these, only 45,474 had been sold at a price of $25.  The remaining approximately 17.95 million Options reportedly had been sold at prices of $0.25 to $1.00 each.  At the time Omega owned millions of Options for which it had been charged $25 each and had understood and been assured by Lewis that these Options had been purchased directly from the SPC.

74.    Having become suspicious of Kozeny's actions on account of this publication and certain other information, Omega launched an investigation into the Azeri privatization investment.  Based on this investigation, in 1999, Omega concluded that it had been defrauded by Kozeny and, as a result, brought legal actions against Kozeny in England and the United States District Court for the District of Colorado.

75.    Omega remained ignorant, however, of Lewis's fraud.  Lewis repeatedly — including in statements to and correspondence with Omega, in a sworn affidavit filed in the legal action in England, and before a grand jury in New York County — professed his innocence and claimed that he had no knowledge concerning any claims of corruption relating to Omega's investment.  Lewis denied being aware that Omega was paying any markups on purchases of Vouchers and/or Options.  He denied having received any bribes or inducements from Kozeny or otherwise in connection with the investment.  And he stated that he would not have entered into the investment if he had any belief that there were corrupt payments involved.

76.    On October 6, 2005, the United States government unsealed the Information to which Lewis had pleaded guilty on February 10, 2004, charging him with violating the FCPA and conspiracy to violate the FCPA based on his actions in connection with the Privatization Program.  In his plea to the Information, Lewis admitted that he had been told by Kozeny of corrupt arrangements with the Azeri officials *before* recommending that Omega make the investment and that he was aware of bribery during the course of the investment.

77.    Specifically, Lewis admitted that:

The first I heard of this investment opportunity was in February or March 1998.  In March 1998 prior to my investing in the privatization process Mr. Kozeny informed me that he had entered into arrangements with some officials of the Azeri government.  It gave those officials a financial interest that [sic] the privatization of the Azerbaijan [sic] industries.

I did not know any other details of the arrangements but understood the interest to involve privatization Vouchers or shares in Mr. Kozeny's company. I was not aware of any tax payments or wire transfers of money in this regard. It was clear to me that the interests had been given [sic] the Azeri officials by Mr. Kozeny prior to my becoming involved in this investment.

With this knowledge I entered into investment with the understanding that I was taking advantage of the arrangements that Mr. Kozeny had already set up. . . .

I learned that a number of the Vouchers were purchased through a person designated by one of the Azeri officials with whom Mr. Kozeny had an arrangement. I expected that in the course of the purchase of our Vouchers a profit or commission of roughly 2 percent would be paid to the person from whom the Vouchers were purchased for services rendered. While I did not explicitly know that any of the profits or commissions from these purchases would go to the Azeri official who designated the individual [from] whom the purchases were made, I became aware of sufficient facts to put me on notice that it was highly probable that at least some of the profits or commissions would be passed on to the Azeri official for the purpose of influencing his official acts.

78.    The unsealing of the Information was Omega's first knowledge that Lewis had repeatedly lied concerning his awareness of Kozeny's claims of a corrupt arrangement with the Azeri officials and his awareness of bribery in connection with the investment. Lewis's lies to the grand jury resulted in his pleading guilty to perjury before the Supreme Court of the State of New York for the County of New York.

79.    Lewis has never acknowledged having himself accepted bribes and secret profits from Kozeny. Only recently has Omega come into possession of documents evidencing this corruption, documents provided to a defendant by the United States Attorney's Office for the Southern District of New York in a criminal proceeding, which only became available to Omega following the dismissal of the charges against that defendant.

**Damage to Omega**

80.    Omega has been significantly injured as a direct, proximate, and reasonably foreseeable consequence of its investment in the privatization of Azeri state-owned enterprises,

which it would not have made but for Lewis's misrepresentations, omissions, false actions, failures to disclose his knowledge, and assurances.

81.    As a direct, proximate, and reasonably foreseeable result of Lewis's wrongful acts, Omega paid excessive prices for Vouchers and/or Options, resulting in injury to Omega of approximately $85 million.   This injury was distributed among the Omega Investment Companies and/or the Omega Holding Companies in proportion to their respective investments. The damages caused to each Omega Investment Company for its overpayments for Option purchases alone break down as follows:

a.    Plaintiff Omega Group Holdings overpaid by $24.61 for each of the approximately 1,478,503 Options that it purchased, resulting in a total loss of approximately $36,385,958.83;

b.    Plaintiff Pine Street overpaid by $24.61 for each of the approximately 653,487 Options that it purchased, resulting in a total loss of approximately $16,082,315.07;

c.    Plaintiff Pinford overpaid by $24.61 for each of the approximately 31,548 Options that it purchased, resulting in a total loss of approximately $776,396.28;

d.    Plaintiff Helendale overpaid by $24.61 for each of the approximately 196,376 Options that it purchased, resulting in a total loss of approximately $4,832,831.36; and

e.    Plaintiff Telos overpaid by $24.61 for each of the approximately 316,643 Options that it purchased, resulting in a total loss of approximately $7,792,584.23.

Omega reserves the right to revise these damages figures if necessary after the completion of discovery.

82.    In the alternative, if the loss were considered to have been suffered by the Omega Holding Companies, the losses resulting from the excess fees charged for the Options that each held would be distributed as follows:

a.    Plaintiff Clifftop held approximately 295,503 Options, each of which was acquired at an excess cost of $24.61, resulting in a total loss of approximately $7,272,328.83;

b.    Plaintiff Hilgore held approximately 400,000 Options, each of which was acquired at an excess cost of $24.61, resulting in a total loss of approximately $9,844,000.00;

c.    Plaintiff Ossian held approximately 400,000 Options, each of which was acquired at an excess cost of $24.61, resulting in a total loss of approximately $9,844,000.00;

d.    Plaintiff Shireton held approximately 383,000 Options, each of which was acquired at an excess cost of $24.61, resulting in a total loss of approximately $9,425,630.00;

e.    Plaintiff Babson held approximately 332,000 Options, each of which was acquired at an excess cost of $24.61, resulting in a total loss of approximately $8,170,520.00;

f.    Plaintiff Conak held approximately 322,000 Options, each of which was acquired at an excess cost of $24.61, resulting in a total loss of approximately $7,924,420.00;

g.    Plaintiff Reno held approximately 31,527 Options, each of which was acquired at an excess cost of $24.61, resulting in a total loss of approximately $775,879.47;

h.      Plaintiff Penasco held approximately 196,225 Options, each of which was acquired at an excess cost of $24.61, resulting in a total loss of approximately $4,829,097.25; and

i.      Plaintiff Kays held approximately 316,643 Options, each of which was acquired at an excess cost of $24.61, resulting in a total loss of approximately $7,792,584.23.

Omega reserves the right to revise these damages figures if necessary after the completion of discovery.

83.     As a further alternative, if the loss were considered to have been suffered by the Omega Funds, the losses resulting from the excess fees charged for the Options that each funded would be distributed as set forth in the individual trade confirmations attached hereto as Exhibit E.

84.     The overpayments reflected in paragraphs 81 through 83 and the corresponding illicit profits garnered by Kozeny allowed him, among other things, to pay the bribes to Lewis described in paragraph 59 above, worth approximately $50 million.

85.     Omega was also forced to pay substantial legal expenses in connection with investigations by the District Attorney's Office for the County of New York and the United States Attorney's Office for the Southern District of New York, expenses incurred as the direct, foreseeable, and proximate result of Lewis's actions while an employee and agent of Omega. These losses total approximately $3.6 million.

86.     As a direct, proximate, and reasonably foreseeable result of Lewis's fraudulent acts and fraudulent conspiracy with Kozeny, Omega lost virtually all of the value of its

investment, the specific amount of which is well in excess of $100 million, as set forth in paragraphs 81 through 83.

87.    As a further direct, proximate, and reasonably foreseeable consequence of Lewis's illegal and fraudulent conduct, Omega's business and reputation were harmed, its assets under management were reduced by approximately $1 billion, the fees that it was able to receive from its investors were correspondingly reduced, and Omega lost approximately $350 million in revenues due to the harm to its business and reputation.

## FIRST CLAIM FOR RELIEF

### (Fraud – All Plaintiffs)

88.    Paragraphs 1 – 87 are realleged and incorporated herein by reference.

89.    Lewis fraudulently induced Omega to invest and to maintain its investment in the Azeri Privatization Program by misrepresentations, false assurances, omissions, false actions, and failures to disclose his knowledge of Kozeny's statements concerning corrupt arrangements with Azeri officials in connection with the privatization of Azeri state-owned enterprises and the indications he has acknowledged having received of illicit commissions paid to Azeri officials in connection with Voucher purchases.  Had Lewis disclosed his awareness of Kozeny's indications of corrupt arrangements, Omega would not have made or continued any investment in the Privatization Program.

90.    Lewis further defrauded Omega by concealing his awareness that Omega was not purchasing Options directly from the SPC and that the prices that Omega paid for Vouchers and/or Options were excessive and reflected massive markups by Kozeny on securities from his own inventory, contrary to the terms of the investment.

91.      Lewis further defrauded Omega by concealing the bribes and/or secret profits paid and/or provided to him by Kozeny, the value of which, as a matter of law, are deemed to have been extracted from the funds provided by Omega for the investment (*i.e.*, the payments are deemed to be part of Omega's overpayment to Kozeny for the securities it purchased).

92.      As an employee, partner, and financial advisor to Omega, Lewis owed Omega duties of care in regard to its investments in Azeri privatization, including fiduciary duties.

93.      To effect these frauds, Lewis intentionally and materially misrepresented that: (i) he knew of no claims of or corrupt arrangements in relation to the Privatization Program; and (ii) Omega was making market purchases from the SPC and (in the case of Vouchers) disinterested third parties rather than marked-up purchases from Kozeny himself and/or persons or companies controlled by him. Lewis defrauded Omega by omitting critical information about the corruption of Azeri officials, the improper markups and self-dealing by Kozeny, and the corruption of Lewis himself by Kozeny and by misrepresenting to Omega that, to the best of his knowledge and belief, Kozeny intended to and would abide by the terms of Minaret's and Oily Rock's co-investment agreements with Omega.

94.      Omega reasonably relied on Lewis's misrepresentations, omissions, false actions, failures to disclose his knowledge, and assurances, among other things by entering into and maintaining the investment in Vouchers and Options.

95.      Lewis directly benefited from defrauding Omega and inducing it to invest and maintain its investment by, among other things, receiving bribes and/or secret profits from Kozeny in the form of Vouchers and Options (through the Rimstone transaction described above in paragraph 59.b), cash (through the Nikolski transaction described above in paragraph 59.c),

36

and financial instruments (through the "Serenada" "profit sharing" arrangement set out above in paragraph 59.a) whose value depended on Omega's participation in the investment.

96.     As a direct and proximate result of Lewis's fraud, Omega has been injured in its business and property as described in paragraphs 81 through 83 above.

WHEREFORE Plaintiffs respectfully request entry of judgment against Defendant for compensatory damages in an amount to be determined at trial, but which are estimated to be in excess of $475 million; for punitive damages to be assessed in the amount of $475 million; for Omega's legal costs in connection with the DANY and SDNY investigations; for prejudgment interest; for the disgorgement of the Defendant's improper gains; for fees and the costs of this suit, including reasonable attorneys' fees; and for such other and further relief as this Court deems just and proper.

## SECOND CLAIM FOR RELIEF

### (Conspiracy and Aiding and Abetting Kozeny's Fraud and Breach of Fiduciary Duties – All Plaintiffs)

97.     Paragraphs 1 – 96 are realleged and incorporated herein by reference.

98.     At all relevant times Lewis knew that compliance with all U.S., Azeri, and other applicable laws (including specifically the FCPA) was a requirement for Omega's participation in the Azeri investment, and at all relevant times Lewis represented to Omega (and to some of its most valued clients) that such compliance was being scrupulously maintained. Specifically, as pleaded in greater detail above, Lewis represented that to the best of his knowledge and diligence no illicit payments or inducements had been or were being provided to Azeri officials in connection with the investment.

99.    At all relevant times, Lewis was in fact aware that, contrary to his representations to Omega and others, illicit payments and inducements had been and were being provided to Azeri officials in connection with the investment.

100.    At all relevant times, Lewis concealed his knowledge of the illicit payments and inducements from Omega and by such acts and omissions misrepresented the true position to Omega and induced Omega to rely on those misrepresentations in committing its funds to and maintaining the investment in Vouchers and Options in circumstances in which he knew Omega would do neither if it was aware of the true facts.

101.    As an employee, partner, and financial advisor to Omega, Lewis owed Omega duties of care in regard to its investments in Azeri privatization, including fiduciary duties.

102.    At all relevant times, Lewis, in addition to having multiple relationships with Omega giving rise to high fiduciary duties, was a senior and trusted employee of the company in whom Omega reposed the highest confidence, particularly in emerging market investments such as the investment in Vouchers and Options, and to whom Omega entrusted significant responsibilities involving these extremely high-value transactions.

103.    Indeed, as the principal liaison with Kozeny, Lewis was the Omega employee with responsibility for monitoring Kozeny's compliance with the terms of the investment and, in particular, the avoidance of bribes or other illicit payments to Azeri officials in violation of the FCPA and the prohibition of Kozeny's selling to Omega at a markup or from his own inventory. While the discussions between Kozeny and Lewis are outside of Omega's knowledge, Omega is aware that Lewis specifically misrepresented to it that Kozeny had agreed to the terms of Oily Rock's and Minaret's co-investment agreements with Omega and, to the best of his knowledge and belief, intended to abide by those agreements.

104.    Lewis's conduct in concealing and misrepresenting critical, material information from Omega concerning bribery of Azeri officials was in breach of his fiduciary duties and constituted a fraud upon Omega.

105.    At all relevant times, Kozeny, through his companies Oily Rock and Minaret, acted as an agent of Omega and therefore also (whether individually or through the companies, or both) owed Omega duties of care including fiduciary duties in respect of the handling and disposition of its funds and assets.

106.    Lewis did not disclose his knowledge of corruption of Azeri officials to Omega and in fact made false and misleading statements and omissions to Omega concerning such corruption because he had been bribed by and had entered into an agreement with Kozeny (whether individually or through the companies, or both) to remain silent about the corruption.

107.    Alternatively, Lewis did not disclose his knowledge of corruption of Azeri officials or of Kozeny's sale of securities to Omega from his own inventory at a huge markup contrary to the terms of the investment and in fact made false and misleading statements and omissions to Omega concerning such activities because he had been bribed by and had entered into an agreement with Kozeny (whether individually or through the companies, or both) to remain silent about the corruption and the markup fraud.

108.    Additionally, Lewis concealed, failed to disclose, and made false and misleading representations with respect to Kozeny's having provided him with and his having accepted multi-million-dollar payments as described above in paragraph 59, a highly material fact which if known to Omega would have caused it not to invest or, having invested, not to continue with the investment and to seek immediate redress from the relevant parties.

109.    By agreeing with Kozeny (whether individually or through the companies, or both) to conceal the corruption of Azeri officials (and/or to conceal the markup fraud) and by making misleading statements and omissions to Omega pursuant to that agreement and contrary to his own fiduciary and other duties to Omega, Lewis both agreed to assist and did knowingly substantially assist and encourage Kozeny in Kozeny's commission (whether acting individually or through his companies, or both) of frauds and breaches of fiduciary duty against Omega.

110.    In conspiring with and aiding and abetting Kozeny in his frauds and breaches of fiduciary duty against Omega, Lewis knowingly entered into and assisted with the execution of a scheme that he knew was designed to allow Kozeny to deceive Omega into committing its funds and then to misapply them for his own benefit and Lewis's.    Lewis knew that Kozeny's assurances that there would be no corruption, no self-dealing, and no markups were fundamental to Omega's willingness to enter into the investment; he knew that those assurances had been provided to and relied upon by Omega; he knew that some or all of them were false; and he knew that Kozeny in fact intended to misapply Omega's funds, whether by paying them away in bribes to Azeri officials or through self-dealing as described herein.    Yet, Lewis allowed Omega to go forward, with disastrous consequences.

111.    As a direct and proximate result of Lewis's conspiracy and aiding and abetting of Kozeny's fraud and breach of fiduciary duty against Omega, Omega has been injured in its business and property as described in paragraphs 81 through 83 above.

WHEREFORE Plaintiffs respectfully request entry of judgment against Defendant for compensatory damages in an amount to be determined at trial, but which are estimated to be in excess of $475 million; for punitive damages to be assessed in the amount of $475 million; for Omega's legal costs in connection with the DANY and SDNY investigations; for prejudgment

interest; for the disgorgement of the Defendant's improper gains; for fees and the costs of this suit, including reasonable attorneys' fees; and for such other and further relief as this Court deems just and proper.

## THIRD CLAIM FOR RELIEF

### (Breach of Contract – All Plaintiffs)

112.    Paragraphs 1 – 111 are realleged and are incorporated herein by reference.

113.    Omega Advisors and Lewis were parties to an employment contract whereby Omega Advisors employed Lewis, as well as a number of investment partnership contracts.  (A true and correct copy of the employment contract is attached hereto as Exhibit F.)

114.    As a condition of his employment with Omega Advisors, Lewis agreed in writing to abide by the terms of the Statement of Policies and Procedures of Omega Advisors, Inc. with Respect to Certain Trading Practices (Aug. 1997) (and a subsequent version of the policy issued in July 1998 that is materially identical) (the "Omega Trading Policy").  (A true and correct copy of the Omega Trading Policy is attached hereto as Exhibit G.)

115.    All of these contracts included the express and implied terms that Lewis would abide by the laws of United States and the State of New York and would not breach the duties of loyalty and good faith that Lewis owed to Omega, and these contracts were intended to and did benefit, either as parties or as third-party beneficiaries, all of the Plaintiffs.

116.    All of these contracts included express and implied terms that Lewis would not engage in self-dealing, accept bribes, take secret profits, steal from Omega, convert to his own use or misapply its assets under his charge, or otherwise act for his own benefit or account and/or contrary to the interests of his employer in respect of the investments he managed and participated in for Omega.

41

117.    By agreeing to abide by the Omega Trading Policy, among other things, Lewis undertook not to "purchase or sell, or otherwise acquire or dispose of, a direct or indirect interest (long or short) in any 'Security' for his or her own account, or the account of any person other than an Omega company" without the express written consent of Omega CEO Lee Cooperman or certain other Omega officers in Mr. Cooperman's absence.  Lewis did not have such written authorization to enter into the transactions described in paragraph 59.a-c above, and in entering into those transactions he clearly breached the Omega Trading Policy as well as the other agreements.

118.    By and through his fraud against Omega and his undisclosed knowledge of Kozeny's corrupt arrangements with the Azeri officials, Lewis materially breached his contracts with Omega Advisors, and Omega has suffered direct and reasonably foreseeable consequential damages as a result of these breaches as set out in paragraphs 81 through 83 above.

WHEREFORE Plaintiffs respectfully request entry of judgment against Defendant for compensatory damages in an amount to be determined at trial, but which are estimated to be $475 million; for Omega's legal costs in connection with the DANY and SDNY investigations; for prejudgment interest; for the disgorgement of Defendant's improper gains from his breaches (which reflect overpayments by Omega to Kozeny and his companies for the Vouchers and Options); for fees and the costs of this action including reasonable attorneys' fees; and for such other and further relief as this Court deems just and proper.

## FOURTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty – All Plaintiffs)

119.    Paragraphs 1 – 118 are realleged and are incorporated herein by reference.

120. At all relevant times, Lewis owed high fiduciary duties to Omega. Lewis's duties as a fiduciary arose from his status as a senior employee of Omega Advisors, his partnership in certain of the Omega Funds, and his position as an agent and investment advisor to these entities, the Omega Investment Companies, and the Omega Holding Companies, in which capacities he was entrusted with faithfully managing and attending to their important financial affairs.

121. Lewis breached his fiduciary duties to Omega by, among other things:

a.    knowingly inducing Omega to enter into (and thereafter to maintain) the investment and causing it to make purchases of Vouchers and/or Options despite indications of corruption of Azeri officials, contrary to Omega's express instructions and the terms of the governing Agreements, and knowing that Omega would never have authorized these actions had it been made aware of the facts;

b.    knowingly causing Omega to purchase Vouchers and/or Options under terms and conditions and/or from sources that violated the terms of Omega's Agreements with Oily Rock and Minaret and amounted to a massive fraud on Omega;

c.    knowingly profiting at Omega's expense in connection with Omega's purchases of Vouchers and/or Options through bribes and/or other inducements, secret profits, and self-dealing;

d.    entering into agreements with Kozeny to prefer Kozeny's interests over Omega's and to deviate from his own employment responsibilities and reporting obligations to Omega in these extremely high-value transactions; and

e.    concealing from Omega Kozeny's indications of corrupt arrangements with Azeri officials, Kozeny's massive fraud on Omega, Lewis's acceptance of bribes from

Kozeny to effectuate this scheme, and other critical and material information relating to Omega's investment.

122.    Lewis's breaches of fiduciary duties were material, and as a direct, proximate, and foreseeable result Omega was injured in its business and property as set out in paragraphs 81 through 83 above.

WHEREFORE Plaintiffs respectfully request entry of judgment against Defendant for compensatory damages in an amount to be determined at trial, but which are estimated to be in excess of $475 million; for punitive damages to be assessed in the amount of $475 million; for Omega's legal costs in connection with the DANY and SDNY investigations; for prejudgment interest; for the disgorgement of Defendant's improper gains including but not limited to the value of the bribes and/or secret profits estimated at $50 million; for fees and the costs of this suit, including reasonable attorneys' fees; and for such other and further relief as this Court deems just and proper.

### FIFTH CLAIM FOR RELIEF

#### (Fraudulent Transfer – All Plaintiffs)

123.    Paragraphs 1 – 122 are realleged and incorporated herein by reference.

124.    At all relevant times, Lewis knew (i) that he had fraudulently induced Omega to invest in Azeri Vouchers and/or Options by failing to disclose material facts, as alleged above and (ii) that he had committed other wrongful acts with regard to Omega through his conduct concerning Omega's investment in the Privatization Program, as alleged above.  At all relevant times, Lewis also knew that if his fraud, breaches of contract, breaches of fiduciary duty, thefts and misapplications of funds, and other wrongful acts were revealed, he would be liable to Omega and others — as well as liable criminally — for the consequences of his acts.

44

125.    At or around the time of Omega's investment in Vouchers and Options, Kozeny, Lewis, and others conspired, as more fully described herein, to place assets, representing bribes by Kozeny of Lewis, into a secret holding structure under a Liechtenstein *Anstalt* set up for his sole benefit while living and for the benefit of certain of his relatives thereafter.

126.    At or around the time that Lewis was engaged in the scheme to defraud Omega, he fraudulently conveyed assets of approximately $15,000,000 to one or more trusts, the specific identities of which are now unknown, whose beneficiaries potentially include himself, his wife, and other family members.

127.    Lewis did not receive fair consideration for his conveyance of assets to the trust, nor did the *Anstalt* provide consideration for the assets fraudulently and corruptly placed within it.

128.    Lewis conveyed the assets to the trust and caused the assets to be conveyed into the *Anstalt* with bad faith and with the fraudulent intent of precluding recovery of damages against him by Omega, as shown by Lewis's knowledge of and participation in the scheme to defraud Omega, the amount of the assets conveyed in comparison with his net worth at the time of the conveyance, his close association with the beneficiaries of the trusts, and the lack of fair consideration for the transfers.

129.    Lewis conveyed assets to the trust and caused assets to be conveyed into the *Anstalt* (and the trust and *Anstalt*, being Lewis's creatures, received these assets) with the actual intent to hinder, delay, and defraud Omega and/or other creditors and in doing so Lewis also rendered himself insolvent and unable to meet his present and/or future obligations to Omega and/or those creditors.

WHEREFORE Plaintiffs respectfully request entry of judgment against Defendant setting aside and declaring the transfer(s) of $15 million invalid and, in the alternative, ordering damages in that amount; for punitive damages to be assessed in the amount of $15 million; for prejudgment interest; for fees and the costs of this suit, including reasonable attorneys' fees; for an injunction restraining the Defendant from dissipating, transferring, disposing of, transacting in, dealing with, or changing the location or status of these assets or causing or influencing others to do so for the benefit of any person other than Omega; and for such other and further relief as this Court deems just and proper.

## SIXTH CLAIM FOR RELIEF

### (Indemnification – Omega Fund Plaintiffs)

130.    Paragraphs 1 – 129 are realleged and incorporated herein by reference.

131.    Prosecutors from the New York County District Attorney's Office, the United States Attorney's Office for the Southern District of New York, and the Fraud Section of the United States Department of Justice (the "Prosecutors") investigated and ultimately brought criminal charges against certain persons who had been involved in the investment in Vouchers and Options in Azerbaijan.  (Neither Omega nor any of its employees or officers - other than Lewis - was charged with wrongdoing in connection with the investment.)

132.    As the proximate, natural, and foreseeable consequence of Lewis's wrongdoing, Omega was required to defend itself in respect of the investigation by the New York County District Attorney's Office into the circumstances of the investments made in Vouchers and Options in Azerbaijan.

133.    Similarly, as the proximate, natural, and foreseeable consequence of Lewis's wrongdoing, Omega was required to defend itself in respect of the investigation by the United

States Attorney's Office for the Southern District of New York and the Fraud Section of the United States Department of Justice.

134.    In order to defend itself, Omega retained the law firms of Schulte Roth & Zabel LLP ("SRZ") and Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C. ("Morvillo").

135.    The Prosecutors decided not to prosecute Omega, and, in or around July 2006, Omega and the United States Attorney's Office for the Southern District of New York and the United States Department of Justice executed a non-prosecution agreement.

136.    Omega incurred and paid approximately $3.6 million in attorneys' fees and costs to SRZ and Morvillo for their services in respect of the investigations by the Prosecutors.

137.    The attorneys' fees and costs were necessarily incurred as the natural, foreseeable, and proximate result of Lewis's wrongdoing.

138.    Under New York law, Omega may recoup the fees and costs from Lewis.

WHEREFORE Plaintiffs respectfully request entry of judgment against Defendant for compensatory damages in an amount to be determined at trial, but which are estimated to be in excess of $3.6 million; for punitive damages to be assessed in the amount of $3.6 million; for prejudgment interest; for fees and the costs of this suit, including reasonable attorneys' fees; and for such other and further relief as this Court deems just and proper.

### SEVENTH CLAIM FOR RELIEF

**(Constructive Trust – Helendale as to Nikolski Transaction; in the alternative, Omega Advisors, Omega Fund Plaintiffs, and Omega Investment Company Plaintiffs as to Nikolski Transaction; and Omega Advisors, Omega Fund Plaintiffs, and Omega Investment Company Plaintiffs as to Rimstone and Serenada Transactions)**

139.    Paragraphs 1 – 138 are realleged and incorporated herein by reference.

47

140.    While acting in his fiduciary capacity as an employee, partner, agent, and financial advisor to Omega, Lewis (i) accepted and/or agreed to accept a 40% interest in Minaret's future profit from the sale of Omega's Vouchers and Options (the Serenada transaction), (ii) accepted and/or agreed to accept a large quantity of Vouchers and Options from Kozeny for free or at a cost far below market prices (the Rimstone transaction), and (iii) "sold" and/or benefited from the "sale" of part of his personal inventory of wrongfully obtained Vouchers and Options *to Omega* at a huge markup, without disclosing his presence in the transaction as counterparty, this wrongful and unauthorized use of Omega's funds resulting in a profit of $5,105,100 (the Nikolski transaction), as described above in paragraph 59.c.

141.    The 40% interest in Minaret's expected profits accepted or agreed to be accepted by Lewis through the Serenada transaction was a bribe paid to Lewis by Kozeny and/or a secret profit taken by Lewis at the expense and without the knowledge of his employer, Omega Advisors, or Omega more generally.  This payment to Lewis, which had a very high market value at the time it was made, was funded by overpayments extracted from the Omega Investment Companies (via payments by the Omega Funds on their behalf) by Kozeny with Lewis's wrongful assistance.  All of the proceeds of the Serenada transaction are thus directly traceable to the Omega Investment Companies and/or the Omega Funds and are subject along with any interest or profits to a constructive trust in favor of Omega.

142.    The approximately $5 million realized through the Nikolski transaction had been entrusted to Lewis by Helendale (or, in the alternative, by Omega Advisors on behalf of the Beta Equities Inc. managed account) and were wrongfully and unlawfully obtained from Omega and/or represent bribes and/or secret profits taken by Lewis at Omega's expense and contrary to duties owed by Lewis to Omega; are directly traceable to funds of Omega, albeit laundered by

accomplices of Kozeny and Lewis as part of their fraudulent scheme; and are subject (along with any interest or profits) to a constructive trust in Omega's favor. Because the $5 million theft / bribe / secret profit taken by Lewis from Omega through the Nikolski transaction was misapplied from funds that belonged to Helendale, and were paid out of the Beta Equities Inc. managed account by Omega Advisors on behalf of Helendale, a constructive trust should be imposed / recognized over these funds in favor of Helendale.

143. The $5 million theft / bribe / secret profit taken by Lewis from Omega through the Nikolski transaction was through the "sale" of 28,050 of the 40,000 vouchers and matching Options gifted to Lewis by Kozeny in the Rimstone transaction. Because the Rimstone transaction itself amounted to a bribe and/or a secret profit paid by Kozeny to Lewis, and because the Nikolski funds are traceable (though laundered) proceeds of the Rimstone Vouchers and Options, a constructive trust over the Nikolski monies in favor of the Omega Investment Companies (or alternatively, if the monies were to be viewed as belonging to the fund level entities, then in favor of the Omega Funds and/or Omega Advisors on behalf of the Beta Equities Inc. managed account) is appropriate for the additional reason that they represent traceable proceeds of the bribe originally paid to Lewis and funded using Omega's money via the Rimstone transaction.

144. The monies paid by the Omega Funds to Kozeny and his companies on behalf of the Omega Investment Companies for Vouchers and/or Options from which the Serenada, Nikolski, and Rimstone bribes were drawn were paid pursuant to and in reliance on representations and promises by Kozeny and Lewis that the funds would be used for a specific purpose, *i.e.*, to purchase Vouchers and Options for Omega in arms-length, market transactions with third parties at best available prices, and would not be used for any other purpose including

specifically (i) bribes or other corrupt payments and (ii) sales of Vouchers and Options from Kozeny's or his companies' own inventory or at a markup. Lewis misled and defrauded Omega in respect of these promises. Lewis also had fiduciary duties to Omega that Lewis breached by allowing these funds to be paid out in these circumstances.

145.     Among other things, in these transactions, Lewis perpetrated a fraud through deliberate and material misrepresentations to Omega Advisors both in its own capacity and in its capacity as the advising entity for the Omega Investment Companies and, in the alternative, the Omega Funds and the Beta Equities Inc. managed account.

146.     Upon information and belief, the Nikolski funds have been moved to the account of a successor corporate or trust entity, possibly Longfield Associated S.A., a company organized under the laws of Panama. Such entity will not have received these assets, upon information and belief, for consideration or on the basis of an arm's length exchange and is not a *bona fide* purchaser for value. The Nikolski funds and any proceeds, profits, or interest thereon remain traceable to Omega's property and therefore subject to a constructive trust in favor of Omega.

147.     Upon information and belief, Vouchers and Options residual from the Rimstone transaction and any proceeds of the Serenada transaction have been moved to the account of a successor corporate or trust entity or entities. Such entity or entities will not have received these assets, upon information and belief, for consideration or on the basis of an arm's length exchange and is / are not a *bona fide* purchaser or purchasers for value. The Rimstone and Serenada assets and any proceeds, profits, or interest thereon remain traceable to Omega's property and therefore subject to a constructive trust in favor of Omega.

148.     There is no adequate remedy at law for Omega's injuries.

WHEREFORE the Plaintiffs seek a judgment imposing a constructive trust over and allowing Helendale and/or Omega to trace into the proceeds of the Nikolski transaction, and further allowing Omega to trace into the proceeds of the Serenada and Rimstone transactions and declaring these assets, to the extent identifiable and wherever they may be found, to be the property of Helendale and/or Omega along with any interest, proceeds, or other profits derived from them; and enjoining the Defendant from dissipating, transferring, disposing of, transacting in, dealing with, or changing the location or status of these assets or causing or influencing others to do so for the benefit of any person other than Omega.  Additionally and/or in the alternative, to the extent that the proceeds of any of the four aforementioned transactions are now of such a value that return of the actual property would not provide full compensation to Plaintiffs for the value of the thefts and/or bribes and/or secret profits at the time they were accepted, Plaintiffs request an equitable judgment requiring Lewis to disgorge an equivalent sum of money to the Plaintiffs.

## EIGHTH CLAIM FOR RELIEF

**(Accounting – Helendale as to Nikolski Transaction;
in the alternative, Omega Advisors, Omega Fund Plaintiffs,
and Omega Investment Company Plaintiffs as to Nikolski
Transaction; and Omega Advisors, Omega Fund Plaintiffs,
and Omega Investment Company Plaintiffs as to
Rimstone and Serenada Transactions)**

149.   Paragraphs 1 – 148 are realleged and incorporated herein by reference.

150.   Based on the same premises set out under the Constructive Trust claim for relief, Omega is entitled to an accounting with respect to the proceeds of the Serenada transaction, the Nikolski transaction, and the Rimstone transaction along with any interest, proceeds, or other profits derived from them.

51

WHEREFORE, Omega seeks an accounting of the approximately $5 million wrongfully obtained from Omega through the Nikolski transaction, the 40,000 Vouchers and matching Options wrongfully obtained with Omega's funds through the Rimstone transaction, and the financial interests wrongfully obtained from Omega through the Serenada transaction, including full disclosure of the location(s), account number(s), nominal owner(s), and other identifying details for the funds, securities, or their proceeds, with any accrued interest or other profits or proceeds derived from them.

## PRAYER FOR RELIEF

WHEREFORE the Plaintiffs request entry of judgment against Defendant (i) for compensatory damages in an amount to be determined at trial, but which are estimated to be in excess of $475 million, punitive damages of $475 million, and prejudgment interest; (ii) requiring disgorgement of the Defendant's improper gains, in an amount to be determined at trial but estimated at $50 million; (iii) setting aside and declaring the transfer(s) of approximately $15 million, as set forth in the Fifth Claim for Relief, invalid or in the alternative ordering damages in that amount, and awarding punitive damages of $15 million; (iv) declaring a constructive trust over and requiring an accounting in respect of the assets identified in the Seventh and Eighth Claims for Relief; (v) enjoining Defendant permanently from dissipating, transferring, disposing of, transacting in, dealing with, or changing the location or status of the assets identified in the Fifth and Seventh Claims for Relief or causing or influencing others to do so for the benefit of any person other than Omega; (vi) awarding the reasonable costs of this suit, including reasonable attorneys' fees; and (vii) providing for such other and further relief as this Court deems just and proper.

Respectfully submitted,


Baach Robinson & Lewis PLLC


Dated:        March 1, 2010                   __s/ Eric L. Lewis_____
                                              Eric L. Lewis            EL 0038
                                              1201 F Street, NW, Suite 500
                                              Washington, D.C. 20004
                                              Tel: (202) 833-8900
                                              Eric.Lewis@baachrobinson.com

                                              Counsel for Plaintiffs


## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury of all claims and issues so triable.



Baach Robinson & Lewis PLLC



Dated:        March 1, 2010                   ___s/ Eric L. Lewis_____
                                              Eric L. Lewis            EL 0038
                                              1201 F Street, NW, Suite 500
                                              Washington, D.C. 20004
                                              Tel: (202) 833-8900
                                              Eric.Lewis@baachrobinson.com

                                              Counsel for Plaintiffs