**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

OMEGA ADVISORS, INC. et al.,

               Plaintiff,

vs.

CLAYTON LEWIS,

               Defendant.

Case No.: 06-cv-834 (NRB)
ECF CASE

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

**LOWENSTEIN SANDLER PC**
Attorneys at Law
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597.2500
Attorneys for Clayton Lewis

**KROVATIN KLINGEMAN LLC**
Attorneys at Law
744 Broad Street, Suite 1903
Newark, New Jersey 07102
(973) 424.9777
Attorneys for Clayton Lewis

## **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ................................................................................................II

PRELIMINARY STATEMENT ......................................................................................... 1

ARGUMENT ...................................................................................................................... 1

I.  THE AMENDED COMPLAINT SHOULD BE DISMISSED FOR LACK OF STANDING ................................................................................................ 4

    A.  All Plaintiffs Except the So-Called "Omega Holding Companies" Lack Standing to Sue for Alleged Injuries Arising from the Sale of the Azeri Securities ............................................................................... 4

    B.  All Plaintiffs Except Omega Advisors Lack Standing to Assert the $350 Million Claim for Loss of Revenues ............................................. 7

    C.  The Amended Complaint Should Be Dismissed for Lack of Standing Because It Fails to Allege Loss Causation ............................................. 8

    D.  Plaintiffs Lack Standing to Assert the "Overpayment" Claims Because They Have Failed to Plead an "Injury in Fact" ...................... 14

II.  JUDICIAL ESTOPPEL BARS ALL ALLEGATIONS THAT CLAYTON LEWIS HAD KNOWLEDGE OF KOZENY'S IMPROPER SALES OF AZERI VOUCHERS AND OPTIONS ............................................................. 15

III.  THE SECOND AND FOURTH CLAIMS ARE PREEMPTED BY THE MARTIN ACT ................................................................................................ 18

IV.  PLAINTIFFS' INDEMNIFICATION CLAIM MUST BE DISMISSED ........................ 20

V.  THE CLAIMS OF THE NEW PLAINTIFFS ARE TIME-BARRED BECAUSE THEY DO NOT RELATE BACK TO THE ORIGINAL COMPLAINT .................................................................................................... 21

VI.  PLAINTIFFS' FRAUDULENT TRANSFER CLAIM AND RELATED CONSTRUCTIVE TRUST CLAIM MUST BE DISMISSED FOR LACK OF PERSONAL JURISDICTION TO THE EXTENT THEY INVOLVE TRANSFERS NOT INVOLVING NEW YORK. ............................................... 22

CONCLUSION .................................................................................................................. 24

## <u>TABLE OF AUTHORITIES</u>

**PAGE**

**Cases**

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155 (S.D.N.Y. 2009) 19

*American Centennial Ins. Co. v. Seguros La Republica, S.A.*, No. 91 Civ. 1235, 1996 WL 304436 (S.D.N.Y. June 5, 1996).......................................................................... 14

*Arico v. Cie. De Navigacion Transoceanique*, 409 F.2d 1002 (2d Cir. 1969) ........................... 20

*Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ............. 3

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779 (2d Cir.1999)............ 23

*Bank of America Corp. v. Lemgruber*, 385 F. Supp. 2d 200 (S.D.N.Y. 2005)..................... passim

*Barrett v. Tema Dev. (1988), Inc.*, 463 F. Supp. 2d 423 (S.D.N.Y. 2006) .................................. 23

*Bartang Bank & Trust Co. v. Caiola*, No. 04 Civ. 2402, 2006 WL 2708453 (S.D.N.Y. Sept. 18, 2006) ............................................................................................................................... 4, 5

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................. 3

*Bennett v. U.S. Trust Co.*, 770 F.2d 308 (2d Cir. 1985)................................................................ 9

*Brass v. Am. Film Techs.*, 987 F.2d 142 (2d Cir. 1993) ............................................................. 16

*Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 (2d Cir. 2001)........................................... 19

*Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489 (2d Cir. 1992)................................................... 9, 11

*CPC Int'l Inc. v. McKesson Corp.*, 70 N.Y.2d 268 (1987) ......................................................... 18

*DiStefano v. Carozzi North America, Inc.*, 286 F.3d 81 (2d Cir. 2001) ................................ 23, 24

*Dura Pharms. v. Broudo*, 544 U.S. 336 (2005) ......................................................................... 11

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003) ......... 8

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994)................................ 12

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990).................................................................. 4

*Giaguaro S.p.A. v. Amiglio*, 257 F. Supp. 2d 529 (E.D.N.Y. 2003)........................................... 16

*Goldberg v. Mallinckrodt, Inc.*, 792 F.2d 305 (2d Cir. 1986) ................................................... 20

*Gordon Partners v. Blumenthal*, 293 F. App'x 815 (2d Cir. 2008)............................................... 9

*Grandon v. Merrill Lynch & Co.*, 147 F.3d 184 (2d Cir. 1998) ..................................................... 3

*Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603 (S.D.N.Y. 2008) .............. 18, 19

*Hoffenberg v. Hoffman & Pollok*, 248 F. Supp. 2d 303 (S.D.N.Y. 2003) .................................... 21

*Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992) ........................................ 5

*In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405 (S.D.N.Y. 2007) ....................................... 19

*In re Bennett Funding Group Sec. Litig.*, 194 F.R.D. 98 (S.D.N.Y. 2000) .................................. 22

*In re Livent Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371 (S.D.N.Y. 2001) .................... 3, 14

*In re Med-Atlantic Petroleum Corp.*, 233 B.R. 644 (Bankr. S.D.N.Y. 1999) ............................. 24

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416 (S.D.N.Y. 2003) 12

*In re SLM Corp. Sec. Litig.*, 258 F.R.D. 112 (S.D.N.Y. 2009) ....................................................... 6

*Jackson Nat'l Life Ins. Co. v. Ligator*, 949 F. Supp. 200 (S.D.N.Y. 1996) ................................. 6

*Jasper v. Sony Music Entm't*, 378 F. Supp. 2d 334 (S.D.N.Y. 2005) .................................... 16, 21

*Lakonia Mgmt. Ltd. v. Meriwether*, 106 F. Supp. 2d 540 (S.D.N.Y. 2000) ................................ 12

*Laub v. Faessel*, 297 A.D.2d 28 (1st Dep't 2002) ..................................................................... 8, 9

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) ............................................ 9, 11, 12

*Levy v. Roemer*, 175 F.3d 254 (2d Cir. 1999) ............................................................................ 22

*Lujan v. Defenders of Wildlife*, 554 U.S. 555 (1992) ................................................................ 4, 8

*Manson v. Stacescu*, 11 F.3d 1127 (2d Cir. 1993) .................................................................... 5, 7

*Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1 (2d Cir. 1999) .............................. 16, 18

*Morin v. Trupin*, 778 F. Supp. 711 (S.D.N.Y. 1991) ................................................................. 22

*N.Y. Trust Co. v. Am. Realty Co.*, 244 N.Y. 209, 155 N.E. 102 (1926) ...................................... 11

*Parex Bank v. Russian Sav. Bank*, 116 F. Supp. 2d 415 (S.D.N.Y. 2000) ................................ 12

*Paris Partners v. Russo*, No. 94 Civ. 5684, 1995 WL 746585 (S.D.N.Y. Dec. 14, 1995)............ 5

*People v. Sala*, 695 N.Y.S.2d 169 (3d Dep't 1999) .................................................................... 19

*Peralta v. Vasquez*, 467 F.3d 98 (2d Cir. 2006) ........................................................................ 18

*Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334 (S.D.N.Y. 2005) .............. 16

*Resolution Trust Corp. v. Young*, 925 F.Supp. 164 (S.D.N.Y. 1996)........................................... 20

*Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113 (2d Cir. 2004) ........................... 16

*S. Ill. Laborers' & Employers Health & Welfare Fund v. Pfizer Inc.*, No. 08 CV 5175 (KMW), 2009 WL 3151807 (S.D.N.Y. 2009)......................................................................................... 8

*Savin v. Ranier*, 898 F.2d 304 (2d Cir. 1990) ........................................................................... 23

*SEC v. Howey Co.*, 328 U.S. 293 (1946) .................................................................................... 19

*Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26 (1976).................................................... 8

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001) ................. 11

*Sunward Elec., Inc. v. McDonald*, 362 F.3d 17 (2d Cir. 2004) .................................................. 23

*United States v. Hays*, 515 U.S. 737 (1995) ................................................................................. 4

*United States v. Levasseur*, 846 F.2d 786 (1st Cir. 1988) .......................................................... 18

*Virtual Countries, Inc. v. Republic of S. Africa*, 148 F. Supp. 2d 256 (S.D.N.Y. 2001) .............. 13

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008).................... 6

*World Skating Fed. v. Int'l Skating Union*, 357 F. Supp. 2d 661 (S.D.N.Y. 2005)............... 23, 24

**Statutes**

N.Y. C.P.L.R. § 302 (2008) ........................................................................................................ 23

**Rules**

FED. R. CIV. P. 12(b) ............................................................................................................ 3, 4, 23

FED. R. CIV. P. 15(c) ................................................................................................................ 21, 22

**Treatises**

14A NY JUR 2D BUSINESS RELATIONSHIPS § 735 (2010) ............................................................ 11

WILLIAM LLOYD PROSSER, TORTS § 110 (4th ed. 1971)............................................................... 10

Defendant Clayton Lewis respectfully submits this memorandum of law in support of his Motion to Dismiss Plaintiffs' Amended Complaint, pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(2) and 12(b)(6).

**PRELIMINARY STATEMENT**

On February 17, 2010, this Court entered an Order permitting Plaintiffs to file an Amended Complaint in this action (the "Order"). The Order provided, "To the extent that there are substantive issues regarding the plaintiffs' proposed amended complaint, they should be dealt with in a narrowly tailored motion to dismiss after the proposed amended complaint is filed." Order at 2. The Amended Complaint was filed on March 1, 2010. Defendant respectfully files this Motion in response to the Court's invitation to move "with a more targeted approach" regarding the Amended Complaint. *Id.*

The fundamental problem with Plaintiffs' case persists: the investment losses allegedly suffered by Plaintiffs do not result from Mr. Lewis' alleged misconduct. In deciding the motion to amend, the Court suggested to Plaintiffs, "Before filing the proposed amended complaint, the plaintiffs should take seriously the arguments raised by the defendant regarding the specificity of the allegations in the proposed amended complaint," focusing in particular on the "relevant investments that were made by the newly added plaintiffs." Order at 3 & n.1. In response, Plaintiffs added additional detail to the Amended Complaint concerning the purchases of Azeri privatization vouchers and options by the various Plaintiffs. Plaintiffs' attempt to comply with the Court's suggestion failed. Despite this voluminous addition of exhibits and charts, the Amended Complaint is still unable to provide the basic specificity required to establish standing to sue for numerous Plaintiffs. The Amended Complaint does not contain factual, non-conclusory, allegations showing how various Plaintiff entities, at multiple levels of ownership in a complex intercorporate structure, were actually injured by Mr. Lewis' alleged conduct, and how their alleged losses were caused by such conduct.

Indeed, Mr. Lewis respectfully submits that the Amended Complaint continues to lack the specificity required by Fed. R. Civ. P. 9(b), or even Fed. R. Civ. P. 8(a), given the lack of specific allegations of misrepresentations, reliance, and the specific entities or persons that are alleged to have been the recipients of such misrepresentations, but he also recognizes that this argument was rejected by

Judge Sprizzo in his ruling from the bench on November 8, 2006. The February 17, 2010 Order specifically precluded "any arguments that were previously made before Judge Sprizzo in the defendant's motion to dismiss the original complaint." Order at 2. Accordingly, this memorandum of law does not make such arguments.

Instead, this Motion addresses the Amended Complaint's failure to properly allege the standing of various plaintiffs to bring this lawsuit, including the lack of allegations of "injury in fact" and causation. Although Mr. Lewis did argue that Plaintiffs failed to allege causation in his June 15, 2006 motion to dismiss the original complaint, that argument did not rely on the "causal connection" element of the doctrine of standing, and it did not focus on the corporate structure and investment issues identified by the Court in the February 17, 2010 Order. Because standing is an element of subject matter jurisdiction, such arguments cannot be waived.

In addition, this Motion points out the irreconcilable contradiction between the position taken by Plaintiffs in the Amended Complaint and the position they took in their litigation against Viktor Kozeny in the United Kingdom. Based on Plaintiffs' specific representations that Mr. Lewis lacked knowledge of Kozeny's mark-up fraud, directly contrary to their claims in this Court, the High Court of Justice in London permitted Plaintiffs to obtain and perpetuate an order that froze Kozeny's assets throughout the world for a period of nine years. They should be held to those positions, and their contrary claims here should be dismissed.

The Motion argues that certain claims in the Amended Complaint are preempted by New York's Martin Act, an argument not previously made to Judge Sprizzo. In addition, as suggested by the Court at a February 11, 2010 conference, the Motion points out the fundamental flaws in the new "indemnification" claim asserted in the Amended Complaint.

This Motion also argues that the newly added Plaintiffs' claims are barred by the statute of limitations. Even though the Order did not accept Defendant's argument that addition of the new plaintiffs to the Amended Complaint would be "futile," this statute of limitations argument adopts the "more targeted approach" to "some portion of the new claims," as ordered by the Court, and is limited to

the contention that the claims of the newly added Plaintiffs do not relate back on grounds of "mistake" pursuant to Fed. R. Civ. P. 15(c).

Finally, this Motion seeks partial dismissal of the Fifth and Eighth Claims for Relief, fraudulent transfer and constructive trust, to the extent that Plaintiffs have failed to allege personal jurisdiction in connection with those claims. Judge Sprizzo expressly reserved decision on this argument in his November 14, 2006 Order disposing of the parties' initial motions to dismiss, and Mr. Lewis withdrew this surviving portion of the initial motion without prejudice, as reflected in an Order of this Court entered on January 22, 2009.

The Amended Complaint fails, as a matter of law, in all these respects, and should therefore be dismissed, in whole or in part.

## ARGUMENT

"On a motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted, the court must accept the well-pleaded factual allegations in the complaint as true . . . to determine whether the complaint itself is legally sufficient." *In re Livent Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 404 (S.D.N.Y. 2001) (citing *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998)). "A plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Factual allegations must be enough to raise a right to relief above the "speculative level" and must set forth a "plausible entitlement to relief." *Id.* at 555, 557. "Rule 12(b)(6) motion practice does not demand that every allegation in the complaint must be deemed true, but only 'factual' assertions. This test would exclude pleadings expressing legal conclusions, speculation and unsubstantiated allegations 'so broad and conclusory as to be meaningless.'" *Livent*, 151 F. Supp. 2d at 405. Morever, "[i]t is not . . . proper to assume that the [plaintiff] can prove facts that it has not alleged . . . ." *Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

On a motion to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of standing, the Court must also assume that the factual allegations of the claims are true, but "standing cannot be inferred argumentatively from averments in the pleadings, but rather must appear affirmatively in the record evaluating a motion to dismiss." *Bank of America Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 218 (S.D.N.Y. 2005). Therefore, even on a motion to dismiss, "it is the burden of the party asserting standing to sue clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *Id.*; *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (same); *Bartang Bank & Trust Co. v. Caiola*, No. 04 Civ. 2402, 2006 WL 2708453, at *4 (S.D.N.Y. Sept. 18, 2006) (same). Finally, questions of standing, which are perhaps the most important of the doctrines of subject matter jurisdiction, cannot be waived, whether or not previously raised. *See United States v. Hays*, 515 U.S. 737, 742 (1995) (citing *FW/PBS*, 493 U.S. at 230-31).

## I.    THE AMENDED COMPLAINT SHOULD BE DISMISSED FOR LACK OF STANDING

In order to meet the "irreducible constitutional minimum of standing," a putative plaintiff must satisfy the three-prong test set forth by the United States Supreme Court in *Lujan v. Defenders of Wildlife*:

> First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

554 U.S. 555, 560-61 (1992). As set forth below, the plaintiffs in this case lack standing to sue because (a) certain of the plaintiffs do not have a "legally protected interest" in the claims they purport to assert, and (b) the Amended Complaint fails to show "a causal connection between the injury and the conduct complained of . . .and not the result of the independent action of some third party not before the court." *Id.* Accordingly, the Amended Complaint should be dismissed.

### A.    All Plaintiffs Except the So-Called "Omega Holding Companies" Lack Standing to Sue for Alleged Injuries Arising from the Sale of the Azeri Securities

This Court has previously observed,

> [T]hose who choose to erect these several tiers of limited liability entities cannot be heard to complain when the Court treats the entities each as distinct for purposes of determining whether they have standing to sue to protect the investment of the natural persons behind the structure. The structure of limited liability cannot lightly be disregarded at the behest of the beneficiaries of limited liability protection where it suits their interests, but then strongly asserted where it does not.

*Paris Partners v. Russo*, No. 94 Civ. 5684, 1995 WL 746585, at *2 (S.D.N.Y. Dec. 14, 1995) (citing *Manson v. Stacescu*, 11 F.3d 1127, 1133 (2d Cir. 1993)). When there is a "remote relationship" between the alleged injuries and the plaintiffs due to a complex intercorporate structure, courts in this Circuit routinely dismiss their claims for lack of standing. *See id.* at *3; *see also Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992) (holding that indirectly-injured customers of directly-injured bankrupt securities brokers lack standing); *Bartang Bank & Trust Co. v. Caiola*, No. 04 Civ. 2402, 2006 WL 2708453 (S.D.N.Y. Sept. 18, 2006) (entities investing in holding companies to acquire securities lack standing); *Bank of America Corp. v. Lemgruber*, 385 F.Supp.2d at 219 (same).

According to the Amended Complaint in this action, the eighteen Plaintiffs are divided among four categories of entities, as follows: (1) Omega Advisors, Inc., a "registered investment advisor," Am. Compl. ¶ 11; (2) Omega Capital Partners, L.P., Omega Capital Investors, L.P., and Omega Overseas Partners, Ltd. (the "Omega Funds"), which are "funds that are advised by Omega Advisors," each of which "committed its funds to be invested in financial instruments issued by the Republic of Azerbaijan, through other entities listed below, for use in the Azeri privatization, Am. Compl. ¶ 12; (3) Pine Street Investment, Ltd., Omega Group Holdings, Ltd., Pinford Portfolio Inc., Telos Finance Ltd., and Helendale Trading Corporation (the "Omega Investment Companies"), which were formed "on behalf of Omega Advisors and the Omega Funds for the purpose of acquiring and holding" the Azeri privatization vouchers and options through other entities listed below, Am. Compl. ¶ 13; and (4) a group of nine entities formed under the laws of the British Virgin Islands, Belize, the Bahamas , and Grenada (the "Omega Holding Companies"), which are "special purpose entities formed to acquire and hold (as nominees and for the benefit of the parent companies listed in paragraph 13)" the Azeri privatization vouchers and options, Am. Compl. ¶ 14. The Amended Complaint pleads its damages "in the

alternative," offering either the Omega Investment Companies, the Omega Funds, or the Omega Holding Companies as cognizable plaintiffs for claims arising from the Azeri investment. *See* Am. Compl. ¶¶ 81-83. Because only the "Omega Holding Companies" actually allegedly "acquired and held" the Azeri privatization vouchers and options, the other entities' claims arising from those sales must be dismissed.[1]

First, the Second Circuit has made it clear that an investment advisor does not have standing to assert fraud and other related claims on behalf of the purchasers it advised. *See, e.g.*, *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 107 (2d Cir. 2008) (investment advisor lacks "injury in fact" for standing purposes). There is no reason to believe that the entities that actually invested in the Azeri privatization securities cannot assert their own rights; indeed, they are plaintiffs in this action. *See Huff*, 549 F.3d at 110. Omega Advisors, Inc. therefore does not have standing to assert claims on behalf of those investment entities; because the Amended Complaint does not allege that Omega Advisors itself expended any funds on any such investments, it lacks any cognizable "injury in fact" in connection with any such sales. *See In re SLM Corp. Sec. Litig.*, 258 F.R.D. 112, 114-15 (S.D.N.Y. 2009) (lead plaintiff investment advisor in securities fraud class action lacked standing).

Second, the "Omega Funds" and "Omega Investment Companies" lack standing, because merely providing the funds to, or on behalf of, another entity, which then in turn purchases securities and loses money on the investment, does not give rise to a cognizable "injury in fact." *See Lemgruber*, 385 F. Supp. 2d at 219-220 (dismissing for lack of standing) ("The only reason the [affiliated investor entities] cannot realize a full return on their investment in [the affiliated holding companies] is because the latter entities did not realize a full return on their investment in the BL Banks."); *see also Jackson Nat'l Life Ins. Co. v. Ligator*, 949 F. Supp. 200, 205-06 (S.D.N.Y. 1996) (plaintiffs that funded corporation that purchased business lacked standing, because injury was suffered by funded corporation).

For the same reasons, only Helendale Trading Corporation, which is actually alleged to have entrusted funds, has standing to assert the Seventh Claim for Relief (Constructive Trust) and the Eighth

---

[1] This result is not surprising, insofar as the Amended Complaint leaves unclear to whom the alleged misrepresentations were made, to what entities any fiduciary duties were owed by Mr. Lewis, or which entities were actual signatories to allegedly breached contracts.

Claim for Relief (Accounting) in connection with the so-called Nikolski transaction, *see* Am. Compl. ¶¶ 142 (Helendale allegedly entrusted Nikolski funds), 150 (accounting theory same as constructive trust). Even accepting as true the allegations that the Omega Funds or other entities were the source of funds for other transactions (the so-called "Rimstone" and "Serenada" transactions), such allegations do not suffice to confer standing on those entities, because the funds were not allegedly provided directly by them to Mr. Lewis (or to Kozeny). *See Lemgruber*, 385 F. Supp. 2d at 222-23 (investor, funding and parent entities lack standing to assert conversion claims). *Cf.* Am. Compl. ¶ 59(c) ("Helendale was established as an investment vehicle for a managed account operated by Omega Advisors for Beta Equities, Inc."). This result makes sense. Any "laundering" alleged here must be seen to include the corporate firewalls that Omega itself erected, through the creation of the Omega Investment Companies and Holding Companies, for liability limitation and other reasons; Omega cannot now be heard to complain about the enforcement of these corporate separations. *See Manson*, 11 F.3d at 1133 ("David Manson, however, chose to operate his business as a corporation to gain certain advantages. He cannot now avoid the consequences of the corporate structure.").

**B.    All Plaintiffs Except Omega Advisors Lack Standing to Assert the $350 Million Claim for Loss of Revenues**

Paragraph 87 of the Amended Complaint claims that as a "direct, proximate, and reasonably foreseeable consequence" of Mr. Lewis's alleged conduct, "Omega's business and reputation were harmed, its assets under management were reduced by approximately $1 billion, the fees that it was able to receive from its investors was correspondingly reduced, and Omega lost approximately $350 million in revenues due to the harm to its business and reputation." As set forth in greater detail below, no such proximate causation exists, but in any event, none of the Plaintiffs other than Omega Advisors, Inc. can assert an "injury in fact" arising from the alleged $350 million loss of hedge fund management fees. The other Plaintiffs do not allege (nor could they) that they are "advisors" that collect revenues from management or advisory fees.

**C.    The Amended Complaint Should Be Dismissed for Lack of Standing Because It Fails to Allege Loss Causation**

As set forth above, in order to show standing, plaintiffs in federal court have long been required to allege "a causal connection between the injury and the conduct complained of – the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)).  This requirement is "constitutional" in nature, under Article III of the United States Constitution.  "Where the causal link between the defendant's actions and the party claiming injury is too remote, the courts will usually find that standing is not present." *Lemgruber*, 385 F. Supp. 2d at 218-19.  Thus, when a plaintiff fails to allege a sufficient causal connection between its alleged injury and the defendant's conduct, it is appropriate to dismiss such claims for lack of standing under Article III.  *See*, *e.g.*, *S. Ill. Laborers' & Employers Health & Welfare Fund v. Pfizer Inc.*, No. 08 CV 5175 (KMW), 2009 WL 3151807 (S.D.N.Y. 2009) (denying state-law claims for lack of standing under Article III, based on failure to allege causal link between alleged misrepresentations and alleged losses).

Here, the Amended Complaint fundamentally fails to make any causal connection between Mr. Lewis's alleged conduct and the alleged damages incurred by some of the Plaintiffs.  "To establish causation, a plaintiff must show both that defendant's misrepresentation induced plaintiff to engage in the transaction in question (transaction causation) and that the misrepresentations directly caused the loss about which plaintiff complains (loss causation)." *Laub v. Faessel*, 297 A.D.2d 28, 31 (1st Dep't 2002). Transaction causation is akin to reliance, and requires only an allegation that "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).  Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Id.*  "The loss-causation requirement – as with the foreseeability limitation in tort – is intended to fix a legal limit on a person's responsibility, even for wrongful acts."

-8-

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) (affirming dismissal for lack of loss causation). These concepts apply to New York common-law fraud, breach of contract, and breach of fiduciary duty claims, not merely securities claims. *See Gordon Partners v. Blumenthal*, 293 F. App'x 815, 818 (2d Cir. 2008) (citing *Laub*, 297 A.D.2d at 31). "Loss causation is the fundamental core of the common-law concept of proximate cause." *Laub*, 297 A.D.2d at 31.

These standards are not met here. *First*, the Amended Complaint's causation allegations reflect only "transaction" causation, not loss causation. Omega alleges throughout that it "would never have invested knowingly in a corrupt scheme involving illegal payments to foreign officials," Am. Compl. ¶ 4, that it would not have "willingly entered into a transaction whereby its funds were used to purchase the promoter's own securities at a huge markup," *id.* ¶ 5, and that Mr. Lewis was part of a scheme to induce Omega "to maintain such investment while concealing from Omega corrupt arrangements he had entered into with the promoter of the investment to defraud Omega and misuse its funds," *id.* ¶ 1. Omega claims that Mr. Lewis's alleged fraudulent concealment of these "realities" caused all of Omega's losses, because Omega allegedly relied on Lewis' misrepresentations and omissions, without which Omega would not have entered into the Azeri transaction. *See id.* ¶¶ 37-39, 41-44, 69, 89, 94, 95, 98, 100, 108, 110, 118, 121. Transaction causation allegations alone, without loss causation, do not suffice to show causation, as a matter of law. *See Bennett v. U.S. Trust Co.*, 770 F.2d 308, 314 (2d Cir. 1985) (dismissing federal and state common law claims for failure to allege "loss causation" even though "but for" causation was alleged); *see also Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1495 (2d Cir. 1992) (dismissing complaint for lack of causation, despite plaintiff's allegation that it would not have entered transaction if purchaser and seller had disclosed their secret side agreement, when the complaint "suggests no reason why the investment was wiped out" and "alleged the cause of [plaintiff's] entering into the transaction in which it lost money but not the cause of the transaction's turning out to be a losing one").

In sum, even if (a) Viktor Kozeny had no financial arrangement with Azeri officials, (b) the source of the options purchased by Omega was the State Property Committee rather than Kozeny, and (c) Kozeny did not bribe Clayton Lewis (as is true), Omega still would have lost its investment in Azeri

privatization vouchers and options because Azeri privatization did not go forward and the worldwide emerging-markets meltdown caused by the Russian debt crisis still occurred.  *See* WILLIAM LLOYD PROSSER, TORTS § 110, at 732 (4th ed. 1971) ("Would the decline in plaintiff's investment have occurred even if defendant's misrepresentation had been true?  If the answer to this question is 'yes,' plaintiff has failed to prove that the misrepresentation proximately caused the decline.").

*Second*, the Amended Complaint nowhere provides any non-conclusory explanation of "loss causation," i.e., of what proximately caused Omega's alleged losses.  Omega's alleged losses are enumerated in Paragraphs 80 through 87 of the Amended Complaint.  First, Omega alleges that it "paid excessive prices for Vouchers and/or Options, resulting in injury to Omega of approximately $85 million," and simply argues that the full amount of the alleged overpayments constitutes Omega's damages.  Am. Compl. ¶¶ 81-83.  Second, Omega apparently believes that Kozeny paid $50 million of this overpayment to Mr. Lewis, and this alleged payment somehow damaged it.[2]  *Id.* ¶ 84.  Third, Omega alleges that it lost "virtually all of the value of its investment, the specific amount of which is well in excess of $100 million," *id.* ¶ 86, although Omega does not explain the discrepancy between this dollar amount and the "$85 million" alleged in Paragraph 81.  Fourth, Omega alleges that it lost $350 million in hedge fund management fee income as a result of harm to its business and reputation, which led to a decrease in its assets under management of approximately $1 billion.  *Id.* ¶ 87.[3]

In reality, however, no factual allegation in the Complaint suggests any causal connection from the alleged loss of Omega's investment, or a decline in its assets under management, to Mr. Lewis's

---

[2] In Paragraph 84 of the Amended Complaint, Omega alleges that the alleged bribe was "worth approximately $50 million."  However, this alleged bribe primarily consisted of a purported grant by Kozeny of "4% of Omega's potential profit."  Am. Compl. ¶ 59(a).  Insofar as Omega pleads that it "lost virtually all of the value of its investment," Am. Compl. ¶ 6, Omega did not make any "potential profit," and the alleged bribe to Mr. Lewis, based on a percentage of such profit, would have no value.  Thus, the so-called "bribe" had no monetary value at all.  Indeed, if Omega's allegation that the bribe was "worth approximately $50 million" were correct, then Omega's own holdings would be "worth" approximately $1.05 *billion*.  Omega's allegation of a bribe "worth" $50 million is absurd.

[3] Omega also alleges that it was forced to "pay substantial legal expenses in connection with investigations by" various prosecutors in connection with the Azeri transaction, totaling "approximately $3.6 million."  *Id.* ¶ 85.  That allegation is treated *infra* in connection with the indemnification claim.

alleged concealment of Kozeny's alleged relationship with officials or Kozeny's alleged profit-taking.[4]

First, mere payment of an excessive price, without any alleged explanation for the subsequent decline in

the value of the securities (as is the case here), does not suffice to show causation, as a matter of law.  *See*

*Dura Pharms. v. Broudo*, 544 U.S. 336, 346-47 (2005) ("artificially inflated purchase price" alone does

not constitute loss causation).  Second, in order to show loss causation, the alleged loss must be both

"foreseeable" and also a "materialization of the concealed risk."  *Lentell*, 396 F.3d at 173; *see also*

*Citibank*, 968 F.2d at 1495 ("To establish loss causation a plaintiff must show that the economic harm

that it suffered *occurred as a result of* the alleged misrepresentations.") (emphasis in original).  Third,

Omega's contention that Mr. Lewis's misrepresentations or omissions caused them to "maintain" the

investment (which in any event could only cover the period through August 1998, when Omega

terminated Lewis, *see* Am. Compl. ¶ 71) allege only reliance and inducement (transaction causation), but

not loss causation -- a causal relationship between the loss of the investment and the alleged concealment

of the Azeri financial arrangements or Kozeny's profit-taking.  *See Suez Equity Investors, L.P. v. Toronto-

Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001) (to establish loss causation, "a plaintiff must allege . . .

that the subject of the fraudulent statement or omission was the cause of the actual loss suffered").  The

Amended Complaint does not allege – and it could not allege – that Mr. Lewis's alleged

misrepresentations and omissions with regard to the Azeri officials and with regard to Kozeny's sale of

his own inventory gave rise to the loss of Omega's entire investment, or to the loss of $1 billion in assets.

The loss of the entire investment was not caused by the "materialization of the risk" allegedly concealed

by Mr. Lewis.  *See Lentell*, 396 F.3d at 173.

---

[4] In this connection, it must be noted that Kozeny's "profit-taking" may not have been a breach of fiduciary duty at all.  The Amended Complaint admits that Kozeny purchased the Azeri vouchers and options "months earlier" than his entry into the Omega transaction or the sales to Omega, Am. Compl. ¶¶ 45, 54, and (other than his contractual obligations to Omega not to sell from his inventory) Kozeny had no fiduciary obligation to sell his own property at anything less than prevailing market rates.  *See, e.g., N.Y. Trust Co. v. Am. Realty Co.*, 244 N.Y. 209, 217-18, 155 N.E. 102, 105 (1926) (director may sell property to corporation, and retain profits without violation of fiduciary duty, when property was acquired outside scope of fiduciary relationship); *see also* 14A NY JUR 2D BUSINESS RELATIONSHIPS § 735 (2010).

The Amended Complaint contains "hints" of the real reasons for the loss of the investment.  First, the Amended Complaint alleges, "It was generally believed in the investment community that significant strategic Azeri state-owned enterprises would be sold pursuant to the Privatization Program, although the timing and ultimate price to be paid were uncertain."  Am. Compl. ¶ 26.  The Amended Complaint nowhere alleges that the enterprises were privatized; in fact, the failure of the Azeri government to privatize caused the Azeri privatization vouchers to decline sharply in value and the market for Azeri privatization vouchers to dry up, and Omega ultimately wrote off the entire investment for that reason alone.  Second, the Amended Complaint alleges that a "financial crisis in Russia" took place in August 1998, causing Mr. Lewis to incur "significant losses" from investments in "Russian financial markets" that led to his termination by Omega.  *Id.* ¶ 71.  In fact, as Omega's CEO Leon Cooperman admitted in a written statement to the Department of Justice, submitted in support of Omega's efforts to escape criminal prosecution, Omega's losses from the Azeri investment were caused primarily by the Russian crisis.[5]  The Court may properly take judicial notice of the worldwide financial downturn on this motion to dismiss, particularly in emerging markets, that arose from the Russian debt crisis.[6]  *See Lentell*, 396 F.3d at 174 ("Where there is a market-wide downturn in a particular industry, however, Plaintiffs must show that their loss was caused by the Defendants' fraud, rather than the intervening events, in order to survive a motion to dismiss."); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994) (same); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 419 (S.D.N.Y. 2003) (taking judicial notice of "burst of the notorious internet bubble" and granting motion to dismiss for lack of

---

[5] In obtaining a non-prosecution agreement for Omega, Leon Cooperman, Omega's founder and CEO, affirmed to the Department of Justice, "No one anticipated the default of the Russian government, and the risk models at Omega and elsewhere failed to account for it."  Krovatin Aff. Ex. A, at 29.  Cooperman's statement to the DOJ was docketed in the London litigation.  *See* Eighth Witness Statement of Christine Sharma, *Omega Holdings Ltd. v. Kozeny*, 2000 Folio 199 (Q.B.), dated May 12, 2008 (Krovatin Aff. Ex. B) ¶¶ 27-29.

[6] The August 1998 worldwide financial crisis has been described in various decisions of this Court.  *See, e.g., Parex Bank v. Russian Sav. Bank*, 116 F. Supp. 2d 415, 419 (S.D.N.Y. 2000) ("Like other emerging world markets, Russia's financial system collapsed after violence erupted in Indonesia in May 1998.  In August of 1998, Russia's Central Bank enacted emergency measures to counteract the country's serious liquidity problem.") (granting motion to dismiss); *Lakonia Mgmt. Ltd. v. Meriwether*, 106 F. Supp. 2d 540, 547 (S.D.N.Y. 2000) ("Among other things, the Russian debt moratorium sparked a 'flight to quality' by investors; that is, investors sought safe, high-quality investments and avoided risk.") (granting motion to dismiss).

causation); *Virtual Countries, Inc. v. Republic of S. Africa*, 148 F. Supp. 2d 256, 267 n.12 (S.D.N.Y.

2001) (taking judicial notice of "decline of the technology-laden NASDAQ stock market in mid-2000"

and granting motion to dismiss).

Indeed, in other courts, Omega has made it clear that the causes of the loss of its Azeri investment

have nothing to do with Clayton Lewis.  In successfully seeking an order from the London court freezing

Viktor Kozeny's assets worldwide, Omega filed the affidavit of its former senior employee Eric Vincent,

who averred:

> From August to October 1998, in reaction to the widening emerging
> markets turmoil that followed the Russian ruble devaluation, a negative
> article in Barron's on the Azeri voucher market . . . and the unexpectedly
> slow pace of the Privatization Program, Omega began marking down the
> value of the Omega Funds' voucher and option investments. . . .  Based
> on the fact that it could not sell even a small portion of its voucher and
> option positions, Omega, toward the end of November 1998, marked
> down its entire investment (vouchers and options) to essentially zero.

*Omega Group Holdings, Ltd. v. Kozeny*, Second Affidavit of Eric Vincent, dated February 4, 2000,

Krovatin Aff. Ex. C, ¶¶ 14, 17.[7]

In any event, the allegations concerning Mr. Lewis's conduct, even if taken as true for purposes

of this motion, do not show how his conduct could have resulted in a loss of the value of the investment,

or the loss of assets under management.  In fact, the Amended Complaint nowhere alleges (and it cannot

allege) that the public disclosure that Omega purchased securities from the inventory of Viktor Kozeny,

or of the Government's FCPA investigation, or of Mr. Lewis's guilty plea, in any way affected the price

of the vouchers and options.  Instead, just like every other investor in Azeri privatization, Omega lost its

investment when the Azeri government decided not to privatize.  Under these circumstances, Plaintiffs'

claims must be dismissed for lack of standing, as a result of their failure to show a "causal connection"

between their injuries and Mr. Lewis's conduct.

---

[7] As set forth in greater detail *infra* Part II, the Court may take judicial notice of this document and the position
taken by Omega therein.  For the reasons articulated in Part II, the London High Court's grant of the "freezing
order" arguably judicially estops Omega from arguing a contrary position in this Court.

D.    **Plaintiffs Lack Standing to Assert the "Overpayment" Claims Because They Have Failed to Plead an "Injury in Fact"**

Omega asserts that it was somehow damaged by paying inflated prices for Azeri privatization securities.  As set forth above, these allegations standing alone do not sufficiently allege causation.  In addition, however, the arithmetic allegations of the Amended Complaint, which are internally self-contradictory, make clear that Omega actually does not allege that it overpaid for the Azeri vouchers and options.  This provides a separate and independent ground to dismiss the Amended Complaint.  In deciding a motion to dismiss at the pleading stage, "a court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice."  *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d at 405-06; *see also American Centennial Ins. Co. v. Seguros La Republica, S.A.*, No. 91 Civ. 1235, 1996 WL 304436, at *16 (S.D.N.Y. June 5, 1996) ("Allegations are not well pleaded if they are 'made indefinite or erroneous by other allegations in the same complaint[, or] ... are contrary to facts of which the Court will take judicial notice.'") (citations omitted).

Here, the allegations of Omega's own Complaint show that Omega paid market prices for their securities, not inflated prices.  Each "voucher" was a booklet that had 4 checks and was required to be accompanied by 4 options.  *See* Am. Compl. ¶¶ 27-28.  Omega alleges that Mr. Lewis received a "bribe" in the form of 40,000 Azeri voucher booklets with 4 corresponding options from Kozeny, which allegedly had a "value" of "$6-$8 million" based on "prevailing market prices."  Am. Compl. ¶ 59(b).  By operation of arithmetic, dividing that alleged value by the number of vouchers and options yields a price range of $150-$200 per voucher booklet with four corresponding options.  (This is a mere mathematical operation: $6,000,000/40,000= $150 and $8,000,000/40,000=$200.)  Thus, Paragraph 59(b) alleges that $150-$200 for a voucher booklet and 4 corresponding options were "prevailing market prices."

In Paragraph 48 of the Amended Complaint, Plaintiffs allege they spent approximately $126 million in total on voucher booklets and options and that they purchased 669,131 voucher booklets with 4

-14-

corresponding options.  By operation of arithmetic, therefore, Plaintiffs paid approximately $189 per voucher booklet with 4 corresponding options for its alleged Azeri privatization scheme ($126,418,396/669,131=$188.93).  This $189 price is within the $150-$200 "prevailing market prices" range that Omega defined in Paragraph 59(b).  Thus, regardless of the source of the privatization options it obtained, Plaintiffs paid market price, not an inflated price.

Indeed, although Plaintiffs allege here that the $25 price charged per individual option by Kozeny was inflated, Am. Compl. ¶ 73, sworn testimony actually confirms that Plaintiffs paid the prevailing market prices for its securities.  In Frederic Bourke's criminal trial in this Court, the transcripts of which have been docketed and are subject to judicial notice, *see infra* Part II, a former Omega senior employee testified that the price of the Azeri options was $25, regardless of the source, and that Kozeny sold the options to Omega at the "government price."  *See U.S. v. Bourke*, Trial Transcript, dated June 29, 2009, Krovatin Aff. Ex. D, at 2758:13-19 (testimony of Eric Vincent).

Thus, Omega has failed sufficiently to allege that Plaintiffs have an "injury in fact"; as a matter of straightforward mathematics, the Amended Complaint does not appear to allege that Omega actually paid prices inflated beyond market value.  Accordingly, any claims arising from such allegations appear to be barred.

## II.  JUDICIAL ESTOPPEL BARS ALL ALLEGATIONS THAT CLAYTON LEWIS HAD KNOWLEDGE OF KOZENY'S IMPROPER SALES OF AZERI VOUCHERS AND OPTIONS

The Amended Complaint alleges that Mr. Lewis participated in an alleged scheme by Viktor Kozeny to defraud Plaintiffs by selling them Azeri vouchers and options at inflated prices.  As shown above, this claim fails as a matter of law.  Moreover, Mr. Lewis has always denied that he had any knowledge of or participation in any such wrongdoing.  In any event, Plaintiffs should be barred from making these claims, because they made exactly the opposite claims in their action against Kozeny in the London High Court of Justice, Queen's Bench Division, Commercial Court, and the London court relied on their assertions in issuing various orders, including an order freezing substantial assets belonging to Kozeny throughout the world (notably including Kozeny's house in Aspen, Colorado, an order that was

sought and obtained in the U.S. District Court for the District of Colorado). The Court may take judicial notice of documents filed with a foreign court. *See*, *e.g.*, *Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334, 375-76 (S.D.N.Y. 2005) (taking judicial notice of litigation filings in Ecuador on motion to dismiss) (citations omitted); *Giaguaro S.p.A. v. Amiglio*, 257 F. Supp. 2d 529, 532 n. 1 (E.D.N.Y. 2003) (holding that on defendants' Rule 12(b) motion to dismiss, the court would take judicial notice of a Canadian complaint, an Italian complaint, and a Canadian decision) (citing *Brass v. Am. Film Techs.*, 987 F.2d 142, 150 (2d Cir. 1993)). Consideration of these documents on this motion to dismiss may give rise to judicial estoppel. *See Jasper v. Sony Music Entm't*, 378 F. Supp. 2d 334, 339, 345-46 (S.D.N.Y. 2005).[8]

　　"The doctrine of judicial estoppel prevents a party from asserting a factual position in one legal proceeding that is contrary to a position that it successfully advanced in another proceeding." *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004) (citing *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999)). "Thus, a party invoking judicial estoppel must show that (1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner, such as by rendering a favorable judgment." *Id.* (citation omitted).

　　As indicated above, Omega's London litigation alleged that Viktor Kozeny had committed fraud in connection with the Azeri investment. *See* Order of Jonathan Hirst, Q.C. ("Hirst Order"), Krovatin Aff. Ex. E ¶ 34. Omega and AIG, the Claimants in that action, sought and obtained a Mareva injunction freezing Kozeny's assets, based upon allegations that Kozeny had defrauded the Claimants by selling Azeri privatization securities to them from his own entities' inventory at inflated prices. *Id.* ¶ 35. In response, Kozeny alleged that the doctrine of unclean hands precluded any recovery by the Claimants. *Id.*

---

[8] Omega's discovery failures have prevented Mr. Lewis from fully analyzing this issue. Omega is in possession of a large number of documents from the London litigation, which are not obtainable from the London court or any other source, but Omega has refused to produce them. Omega attempted to argue to Judge Sprizzo that it was precluded by British law from producing those documents to Mr. Lewis. On September 11, 2007, Judge Sprizzo rejected Omega's argument and ordered Omega to produce the London documents. Omega has continued to fail to produce the most critical documents from the London litigation.

¶ 93.  He alleged that the Claimants knew about his financial arrangements with Azeri officials.  *Id.* ¶¶ 38-47.

Mr. Lewis denied, and denies to this day, any knowledge of Kozeny's alleged mark-up scheme. In response to Kozeny's unclean hands defense, Omega repeatedly insisted, in sworn submissions to the London court, that Mr. Lewis had no knowledge of the so-called "mark-up fraud."  Partly and expressly on the basis of this representation, the London court denied Kozeny's motions to dismiss or to discharge the orders freezing his assets.  *See* Hirst Order ¶¶ 121-22, 178-79.  Kozeny then sought a hearing on these issues; the English court scheduled a hearing for January 2009.  *See* July 30, 2008 Order in *Marlwood Commercial Inc. v. Kozeny*, Krovatin Aff. Ex. F.

In its Amended Particulars of Claim, filed November 21, 2008, Omega did not include Lewis in any claims related to the "mark-up fraud."  Further, in its reply filed a week later, Omega expressly pled that Mr. Lewis had no knowledge of Kozeny's profit-taking scheme, including that "Mr. Lewis believed at all times that options were being purchased from [the Azeri State Property Committee]," as opposed to from another source.  Re-Re-Amended Consolidated Reply to the Defence of the First, Third and Fourth Defendants, dated November 28, 2008, Krovatin Aff. Ex. G ¶ 119.4.  In their opening submission to the court for the January 2009 trial, Omega made multiple statements in support of the proposition that Lewis was not involved in the mark-up fraud, including that "the Deputy Judge made no finding that Mr Lewis was aware that option prices were fraudulently marked up by the Defendants, and there is no finding or assumption that Mr Lewis did know of it."  Claimants' Opening Submissions for Trial of Preliminary Issues, Krovatin Aff. Ex. H, ¶ 183.[9]

These circumstances satisfy the conditions for judicial estoppel.  First, Omega's position in the London litigation – that Mr. Lewis was not aware of Kozeny's fraudulent sale of allegedly overpriced

---

[9] Any suggestion that Omega's inconsistent positions resulted from the disclosure to them of certain documents in 2008 would be specious.  First, Omega continued to maintain their position in the London litigation through January 2009, long after they had received any documents relating to these issues.  Second, Omega asserted the same inconsistent claims regarding Kozeny's mark-up fraud and alleged bribery of Mr. Lewis, albeit at a lower level of detail (presumably to preserve their London position to the extent possible), in the original Complaint in this action, filed  on February 2, 2006.  *See* Original Complaint ¶¶ 43, 45, 55, 60, 70(b), 70(c).

Azeri vouchers and options to Omega – is plainly inconsistent with its claims here that Mr. Lewis is liable for fraud, breach of fiduciary duty, and conspiracy and aiding and abetting Kozeny's fraud and breach of fiduciary duty. *See Peralta v. Vasquez*, 467 F.3d 98, 105 (2d Cir. 2006) ("Judicial estoppel ensures, inter alia, that 'abandonment of a claim to obtain a litigation advantage precludes the later reassertion of that claim.'") (quoting *United States v. Levasseur*, 846 F.2d 786, 799 (1st Cir. 1988)). Second, Omega's position on this issue was clearly adopted by the London High Court "in some manner." *Mitchell*, 190 F.3d at 6; *see Peralta*, 467 F.3d at 105 (if court only allowed the previous suit to be maintained because of the relinquishment of a position, "the reliance requirement of judicial estoppel would certainly be met" in subsequent proceedings). The court granted the Claimants' motions for asset freezing orders, reaffirmed those orders when challenged by Kozeny, and denied Kozeny's motion to dismiss, permitting the litigation and discovery to continue for several years in express reliance on the Claimants' representation that Mr. Lewis had no knowledge of Kozeny's "mark-up fraud." Accordingly, the Court should dismiss the fraud, breach of fiduciary duty, breach of contract, conspiracy and aiding and abetting, and any other claims in the Amended Complaint to the extent these claims allege that Mr. Lewis knowingly participated directly or indirectly in the sale of Azeri vouchers and options at an inflated price from Kozeny's inventory.

## III.    THE SECOND AND FOURTH CLAIMS ARE PREEMPTED BY THE MARTIN ACT

The Amended Complaint's Second Claim for Relief (Aiding and Abetting Kozeny's Fraud and Breach of Fiduciary Duty) and Fourth Claim for Relief (Breach of Fiduciary Duty) of the Amended Complaint are preempted by New York's Martin Act, and should therefore be dismissed. The Martin Act, N.Y. Gen. Bus. Law. §§ 352, *et seq.*, is New York's "blue sky" law, which "prohibits various fraudulent and deceitful practices in the distribution, exchange, sale, and purchase of securities" for transactions that are "within or from" New York. *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 610 (S.D.N.Y. 2008). The New York State Attorney General is granted the sole authority to enforce the provisions of the Martin Act, and it is well established that no private right of action under the Act exists. *See CPC Int'l Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 276 (1987).

Accordingly, New York courts, including the Second Circuit, hold that the Martin Act preempts common law claims that arise out of securities transactions within or from New York. *See In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 421 (S.D.N.Y. 2007); *see also Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 190 (2d Cir. 2001). The threshold requirements for Martin Act preemption are satisfied here: The Azeri Vouchers and Options qualify as securities under the Martin Act because Omega (1) invested its money (2) in a common enterprise of the Azeri Privatization Program and (3) was led to expect profits solely from the efforts of the promoter or a third party. *See People v. Sala*, 695 N.Y.S.2d 169, 194 (3d Dep't 1999) (quoting *SEC v. Howey Co.*, 328 U.S. 293, 293-299 (1946)). The Martin Act's jurisdictional limitation to transactions "within or from" New York is satisfied because the Amended Complaint alleges that a substantial portion of the events giving rise to the claims occurred in New York. *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 182 (S.D.N.Y. 2009); *see also* Am. Compl. ¶¶ 10 (venue proper in New York), 11 (Omega principal place of business in New York).

Breach of fiduciary duty claims and aiding and abetting breach of fiduciary duty claims that satisfy these requirements are preempted by the Martin Act if they (1) "arise from the alleged securities fraud," and (2) allege "dishonesty or deception." *Heller,* 590 F. Supp. 2d at 612 (internal quotations omitted); *see also Abu Dhabi Commercial Bank*, 651 F. Supp. 2d at 172 (noting that the "Martin Act preempts, at least … breach of fiduciary duty … and aiding and abetting [of breach of fiduciary duty]"). These prerequisites are satisfied here. First, the fiduciary duty claims clearly arise from the alleged securities fraud. Count Two alleges that "Lewis owed Omega duties of care in regard to its investments in Azeri privatization, including fiduciary duties," Am. Compl. ¶ 101, and that "Kozeny . . . acted as an agent of Omega and therefore also (whether individually or through the companies, or both) owed Omega duties of care including fiduciary duties in respect of the handling and disposition of its funds and assets," *id.* ¶ 105. Similarly, Paragraph 121 of Count Four alleges that "Lewis breached his fiduciary duties to Omega by, among other things," undertaking all of the misconduct alleged in the Amended Complaint. Second, Counts Two and Four both allege "dishonesty or deception." Count Two alleges that Lewis

-19-

breached his fiduciary duty by participating in "a scheme that he knew was designed to allow Kozeny to deceive Omega." *Id.* ¶ 110. In Count Four, Plaintiffs allege, among other things, that Lewis breached his alleged fiduciary duties "knowing that Omega would never have authorized these actions had it been made aware of the facts." *Id.* ¶ 121. Therefore, Counts Two (aiding and abetting breach of fiduciary duty) and Four (breach of fiduciary duty) are preempted by the Martin Act, and these counts of the Amended Complaint should be dismissed in their entirety.

## IV.    PLAINTIFFS' INDEMNIFICATION CLAIM MUST BE DISMISSED

The Sixth Claim for Relief purports to seek "Indemnification" for legal fees allegedly expended by the "Omega Fund Plaintiffs" in connection with various prosecuting authorities' investigation of Omega's role in the Azeri transaction. As the Court suggested in the February 11, 2010 conference on the Motion to Amend, Tr. 42:24-44:13, this claim is not viable and should be dismissed.

First, these allegations simply do not suffice to state a claim for indemnification. "Under New York law, a claim for indemnification arises only under an express contract of indemnification, or where one defendant is held vicariously liable for the negligence of another." *Resolution Trust Corp. v. Young*, 925 F.Supp. 164, 169 (S.D.N.Y. 1996) (dismissing indemnification claim). No indemnification contract is alleged here, and Omega does not allege that it paid damages on a third party's claim on a theory of vicarious liability. Moreover, under ordinary circumstances, an employer is not permitted to seek attorneys' fees from its employees arising from its defense of an action by a third party. *See*, *e.g.*, *Arico v. Cie. De Navigacion Transoceanique*, 409 F.2d 1002, 1004 (2d Cir. 1969) (no indemnification award of attorneys' fees to employer against employees when third-party claim against employer arose from negligence of employees). Finally, even if this "indemnification" claim is construed as a claim for consequential damages arising from other tort claims, it falls short, because, among other reasons, such claims are barred when both the alleged indemnitor and the alleged indemnitee were parties to the same underlying action with the same third party (here, the Government's investigation). *See Goldberg v. Mallinckrodt, Inc.*, 792 F.2d 305, 309 (2d Cir. 1986).

Second, based on documents docketed in this Court and the London court, Omega had its own exposure to criminal liability, and its expenditure of attorneys' fees in connection with the prosecutors' investigation cannot have arisen solely as a result of its relationship with Mr. Lewis, as required for an "indemnification" claim. Omega in fact paid a penalty of $500,000 as part of its non-prosecution agreement with the Government, even though Omega alleges that "neither Omega nor any of its employees or officers" other than Mr. Lewis "was charged with wrongdoing in connection with the investment." Am. Compl. ¶ 131. *See* Non-Prosecution Agreement Between Omega and United States Attorney for the Southern District of New York, Krovatin Aff. Ex. I.[10] (Notably, and correctly, Omega does not appear to be seeking reimbursement of this penalty payment from Mr. Lewis.) In his final summation at the criminal trial of Frederic Bourke in connection with the Azeri investment, for example, the federal prosecutor specifically commented that there was "strong circumstantial evidence" that Eric Vincent, an Omega employee, was "aware of this bribery scheme," and that there was also "plenty of circumstantial evidence against" Leon Cooperman, Omega's founder and CEO. *See U.S. v. Bourke*, Trial Transcript dated July 7, 2009, at 3288 (S.D.N.Y.).[11] We have been unable to identify any authority that would permit a claim for "indemnification" for attorneys' fees under these circumstances.

## V.    THE CLAIMS OF THE NEW PLAINTIFFS ARE TIME-BARRED BECAUSE THEY DO NOT RELATE BACK TO THE ORIGINAL COMPLAINT

The claims asserted on behalf of the four new plaintiffs, Pinford, Helendale, Reno, and Penasco, are untimely unless they relate back to the original Complaint under Rule 15(c).[12] The Second Circuit plainly requires satisfaction of Rule 15(c)(1)(C)'s "mistake" requirement regardless of whether the

---

[10] This document was filed and docketed in the London litigation as an attachment to an affidavit of Kozeny's counsel. *See* Eighth Witness Statement of Christina Suzanne Sharma, Krovatin Aff. Ex. B ¶ 26. The Court may take judicial notice of this document for purposes of this motion to dismiss. *See supra* Part II.

[11] The Court may take judicial notice of such docketed trial transcripts in deciding a motion to dismiss. *See, e.g.*, *Jasper v. Sony Music Entm't,* 378 F.Supp.2d 334, 339, 344-45 (S.D.N.Y. 2005).

[12] Omega undisputedly knew at the time it filed the original Complaint on February 2, 2006 of the alleged facts upon which the new Plaintiffs' claims are based. Thus, even assuming the discovery rule or the doctrine of equitable estoppel could apply, the statute of limitations could only be extended for an additional two years from the filing of the original Complaint (at the latest). Because more than two years have elapsed since that time, Omega's time-barred new claims cannot be resuscitated. *See Hoffenberg v. Hoffman & Pollok,* 248 F. Supp. 2d 303, 309 (S.D.N.Y. 2003).

motion seeks to add new defendants or new plaintiffs. *See Levy v. Roemer*, 175 F.3d 254, 255 (2d Cir.

1999) (affirming dismissal of complaint as time-barred and holding that amended complaint did not relate

back where original plaintiff "did not seek to add the [additional plaintiffs] as plaintiffs because of a

mistake"); *In re Bennett Funding Group Sec. Litig.*, 194 F.R.D. 98, 100 (S.D.N.Y. 2000) ("well

established case law and the clear dictates of Rule 15(c) require that plaintiffs invoking the relation back

doctrine demonstrate that their failure to add new plaintiffs was the product of some mistake, rather than a

deliberate decision.").

Omega, however, has not alleged, and it could not allege, that the addition of the four new

plaintiffs was due to mistake.  *See Morin v. Trupin*, 778 F. Supp. 711, 735 (S.D.N.Y. 1991) (claims did

not relate back because "there has been no suggestion" that the new plaintiffs were omitted from the

original complaint by mistake), *reargument granted on other grounds*, 823 F. Supp. 201 (S.D.N.Y. 1993).

In fact, it is beyond dispute that Omega was well aware of all four of the new plaintiffs at the time it filed

the original Complaint: two of the new plaintiffs – Pinford and Helendale – were parties to the English

case commenced against Kozeny in 2000 while all four were parties to a "Tolling and Standstill

Agreement" entered into in 2005.  Because Omega's addition of the new Plaintiffs was a "deliberate

decision," rather than a "mistake," Rule 15(c) does not apply.  *Bennett Funding*, 194 F.R.D. at 100.

Therefore, because Omega has failed to meet Rule 15(c)'s mistake requirement, the claims asserted on

behalf of the new plaintiffs do not relate back to the date of the original Complaint, and must be dismissed

as time-barred.  *Levy*, 175 F.3d at 255.

## VI.  PLAINTIFFS' FRAUDULENT TRANSFER CLAIM AND RELATED CONSTRUCTIVE TRUST CLAIM MUST BE DISMISSED FOR LACK OF PERSONAL JURISDICTION TO THE EXTENT THEY INVOLVE TRANSFERS NOT INVOLVING NEW YORK.

The Fifth Claim for Relief purports to assert a claim against Mr. Lewis for alleged fraudulent

transfers.[13]  The Seventh Claim for Relief seeks to impose a constructive trust based in part on some of

those alleged fraudulent transfers.  If any such transfers were to have occurred during the time that he

---

[13] As confirmed in the Court's January 21, 2009 order, this portion of Mr. Lewis's July 5, 2006 motion to dismiss this claim in the original Complaint for lack of personal jurisdiction was deferred by Judge Sprizzo and ultimately withdrawn without prejudice.

worked in New York, Mr. Lewis does not dispute that personal jurisdiction would exist over such transfers (without conceding the substantive validity of these claims). To the extent that the fraudulent transfer claim purports to cover activities after Mr. Lewis's permanent departure from New York, however, no personal jurisdiction would exist over such claims.

 "When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano v. Carozzi North America, Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir.1999)); *World Skating Fed. v. Int'l Skating Union*, 357 F. Supp. 2d 661, 663 (S.D.N.Y. 2005) ("On a motion to dismiss for lack of personal jurisdiction, Fed.R.Civ.P. 12(b)(2), in which no discovery on the issue has been taken, 'plaintiff bears the burden of making a prima facie case that jurisdiction exists.'"). In addition, "[a] plaintiff must establish the court's [personal] jurisdiction with respect to *each* claim asserted." *Sunward Elec., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004) (emphasis in original); *Barrett v. Tema Dev. (1988), Inc.*, 463 F. Supp. 2d 423, 428 (S.D.N.Y. 2006). Accordingly, Omega must meet its burden to establish personal jurisdiction on Counts Five and Seven, and cannot rely on the allegations of its other causes of action to do so.

 "In diversity cases, federal courts must look to the forum state's long-arm statute to determine if personal jurisdiction may be obtained over a nonresident defendant." *Savin v. Ranier*, 898 F.2d 304, 306 (2d Cir. 1990) (citation omitted). Here, none of the three relevant prongs of CPLR Section 302, New York's long-arm statute, provides any basis for personal jurisdiction.

 CPLR Section 302(a)(1) "confers jurisdiction only as to a cause of action arising from such transaction of business," requiring an "articulable nexus, such that the cause of action would not exist without the New York activities of the defendant." *World Skating Fed.*, 357 F. Supp. 2d at 665. The Amended Complaint does not intelligibly allege that any fraudulent transfer claims occurring after Clayton Lewis left New York State arose out of any business transacted in New York, nor does it allege "New York activities" underlying any such alleged transfers. CPLR Section 302(a)(2) "requires that the defendant be physically present within New York at the time of the tortious act." *World Skating Fed.*,

357 F. Supp. 2d at 665.  Thus, no personal jurisdiction exists with respect to any transfers that occurred after his departure from Omega, when Mr. Lewis was not physically present in New York.

Under CPLR Section 302(a)(3), courts must generally "apply a situs-of-injury test" asking the location of "the original event which caused the injury" and requiring that jurisdiction be "based upon … a closer expectation of consequences within the State than the indirect financial loss resulting from the fact that the injured person resides or is domiciled there."  *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d at 84 (citations and internal quotations omitted).  Omega cannot meet the situs-of-injury test with respect to transfers of assets that were not made from or did not involve New York.  *See In re Med-Atlantic Petroleum Corp.*, 233 B.R. 644, 660 (Bankr. S.D.N.Y. 1999).  Here, the "original event" is the alleged transfer of assets, with the resulting injury "localized" in the jurisdiction from which the funds were transferred.  Because there is no allegation that any assets were transferred out of New York, and in fact no such allegation could truthfully be made, there is no "injury" in New York for purposes of Section 302(a)(3).  Accordingly, the Court should enter an order dismissing these claims to the extent they do not involve transfers that took place when Lewis was living, working or holding assets in New York.

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed.

DATED:  April 5, 2010

Respectfully submitted,

**KROVATIN KLINGEMAN LLC**


By:   s/ Gerald Krovatin
Gerald Krovatin


**LOWENSTEIN SANDLER PC**
Attorneys at Law
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500

Attorneys for Defendant Clayton Lewis

Attorneys at Law
744 Broad Street, Suite 1903
Newark, New Jersey 07102
(973) 424.9777
Email: gkrovatin@krovatin.com

Attorneys for Defendant Clayton Lewis